# EXHIBIT A

**Appendix XII-B1**



# CIVIL CASE INFORMATION STATEMENT (CIS)

Use for initial Law Division
Civil Part pleadings (not motions) under *Rule* 4:5-1
**Pleading will be rejected for filing, under *Rule* 1:5-6(c),
if information above the black bar is not completed
or attorney's signature is not affixed**

| FOR USE BY CLERK'S OFFICE ONLY | |
|---|---|
| PAYMENT TYPE: ☐ CK ☐ CG ☐ CA | |
| CHG/CK NO. | |
| AMOUNT: | |
| OVERPAYMENT: | |
| BATCH NUMBER: | |

| ATTORNEY / PRO SE NAME | TELEPHONE NUMBER | COUNTY OF VENUE |
|---|---|---|
| Richard J. Hollawell | (856) 778-5500 | Middlesex |

| FIRM NAME (if applicable) | DOCKET NUMBER (when available) |
|---|---|
| Console | Hollawell, PC | L 1859-17 |

| OFFICE ADDRESS | DOCUMENT TYPE |
|---|---|
| Five Greentree Centre, 525 Route 73 North, Suite 117, Marlton, NJ 08053 | Complaint |
| | JURY DEMAND  ■ YES   ☐ No |

| NAME OF PARTY (e.g., John Doe, Plaintiff) | CAPTION |
|---|---|
| Deborah Fuller & David Fuller as Administrators Ad Prosequendum for the Estate of Sarah A. Fuller, deceas | Deborah Fuller & David Fuller as Administrators Ad Prosequendum for the Estate of Sarah A. Fuller, deceased v. Vivienne Matalon, M.D., TLC Healthcare 2, LLC, Insys Therapeutics, Inc., Linden Care, LLC, et al. |

| CASE TYPE NUMBER (See reverse side for listing) | HURRICANE SANDY RELATED? | IS THIS A PROFESSIONAL MALPRACTICE CASE?   ■ YES   ☐ NO |
|---|---|---|
| 604 | ☐ YES  ■ NO | IF YOU HAVE CHECKED "YES," SEE *N.J.S.A.* 2A:53 A -27 AND APPLICABLE CASE LAW REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |

| RELATED CASES PENDING? | IF YES, LIST DOCKET NUMBERS |
|---|---|
| ☐ Yes  ■ No | |

| DO YOU ANTICIPATE ADDING ANY PARTIES (arising out of same transaction or occurrence)? | NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY (if known) | |
|---|---|---|
| ☐ Yes  ■ No | MDAdvantage Insurance Company of New Jersey | ☐ NONE  ☐ UNKNOWN |

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE.**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

| DO PARTIES HAVE A CURRENT, PAST OR RECURRENT RELATIONSHIP? | IF YES, IS THAT RELATIONSHIP: | |
|---|---|---|
| ☐ Yes  ■ No | ☐ EMPLOYER/EMPLOYEE   ☐ FRIEND/NEIGHBOR   ☐ OTHER (explain)  ☐ FAMILIAL   ☐ BUSINESS | |

| DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY? | ☐ Yes   ■ No |
|---|---|

USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR
ACCELERATED DISPOSITION

| ♿ | DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS? | IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION |
|---|---|---|
| | ☐ Yes  ■ No | |
| | WILL AN INTERPRETER BE NEEDED? | IF YES, FOR WHAT LANGUAGE? |
| | ☐ Yes  ■ No | |

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be
redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b).

| ATTORNEY SIGNATURE: | *Richard J. Hollawell* |
|---|---|



**Side 2**

# CIVIL CASE INFORMATION STATEMENT
## (CIS)
### Use for initial pleadings (not motions) under *Rule* 4:5-1

**CASE TYPES** (Choose one and enter number of case type in appropriate space on the reverse side.)

**Track I - 150 days' discovery**
151    NAME CHANGE
175    FORFEITURE
302    TENANCY
399    REAL PROPERTY (other than Tenancy, Contract, Condemnation, Complex Commercial or Construction)
502    BOOK ACCOUNT (debt collection matters only)
505    OTHER INSURANCE CLAIM (including declaratory judgment actions)
506    PIP COVERAGE
510    UM or UIM CLAIM (coverage issues only)
511    ACTION ON NEGOTIABLE INSTRUMENT
512    LEMON LAW
801    SUMMARY ACTION
802    OPEN PUBLIC RECORDS ACT (summary action)
999    OTHER (briefly describe nature of action)

**Track II - 300 days' discovery**
305    CONSTRUCTION
509    EMPLOYMENT (other than CEPA or LAD)
599    CONTRACT/COMMERCIAL TRANSACTION
603N   AUTO NEGLIGENCE – PERSONAL INJURY (non-verbal threshold)
603Y   AUTO NEGLIGENCE – PERSONAL INJURY (verbal threshold)
605    PERSONAL INJURY
610    AUTO NEGLIGENCE – PROPERTY DAMAGE
621    UM or UIM CLAIM (includes bodily injury)
699    TORT – OTHER

**Track III - 450 days' discovery**
005    CIVIL RIGHTS
301    CONDEMNATION
602    ASSAULT AND BATTERY
604    MEDICAL MALPRACTICE
606    PRODUCT LIABILITY
607    PROFESSIONAL MALPRACTICE
608    TOXIC TORT
609    DEFAMATION
616    WHISTLEBLOWER / CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA) CASES
617    INVERSE CONDEMNATION
618    LAW AGAINST DISCRIMINATION (LAD) CASES

**Track IV - Active Case Management by Individual Judge / 450 days' discovery**
156    ENVIRONMENTAL/ENVIRONMENTAL COVERAGE LITIGATION
303    MT. LAUREL
508    COMPLEX COMMERCIAL
513    COMPLEX CONSTRUCTION
514    INSURANCE FRAUD
620    FALSE CLAIMS ACT
701    ACTIONS IN LIEU OF PREROGATIVE WRITS

**Multicounty Litigation (Track IV)**

| | | | |
|---|---|---|---|
| 271 | ACCUTANE/ISOTRETINOIN | 292 | PELVIC MESH/BARD |
| 274 | RISPERDAL/SEROQUEL/ZYPREXA | 293 | DEPUY ASR HIP IMPLANT LITIGATION |
| 281 | BRISTOL-MYERS SQUIBB ENVIRONMENTAL | 295 | ALLODERM REGENERATIVE TISSUE MATRIX |
| 282 | FOSAMAX | 296 | STRYKER REJUVENATE/ABG II MODULAR HIP STEM COMPONENTS |
| 285 | STRYKER TRIDENT HIP IMPLANTS | 297 | MIRENA CONTRACEPTIVE DEVICE |
| 286 | LEVAQUIN | 299 | OLMESARTAN MEDOXOMIL MEDICATIONS/BENICAR |
| 287 | YAZ/YASMIN/OCELLA | 300 | TALC-BASED BODY POWDERS |
| 289 | REGLAN | 601 | ASBESTOS |
| 290 | POMPTON LAKES ENVIRONMENTAL LITIGATION | 623 | PROPECIA |
| 291 | PELVIC MESH/GYNECARE | | |

If you believe this case requires a track other than that provided above, please indicate the reason on Side 1,
in the space under "Case Characteristics.

**Please check off each applicable category** ☐ **Putative Class Action** ☐ **Title 59**

CONSOLE & HOLLAWELL, P.C.
Richard J. Hollawell, Esquire
Attorney I.D. No.: 018122001
Mark C. Dewland, Esquire
Attorney I.D. No.:023871986
Five Greentree Centre
525 Route 73 North, Suite 117
Marlton, New Jersey 08053
(856) 778-5500

Attorney for Plaintiff, Deborah Fuller & David
Fuller as Administrators Ad Prosequendum for
the Estate of Sarah A. Fuller, deceased, and
Deborah Fuller & David Fuller, Individually

CIVIL RECORDS
N.J. SUPERIOR COURT
MIDDLESEX VICINAGE

2011 JAN 23 P 2 14

FILED & RECEIVED #5

---

DEBORAH FULLER & DAVID FULLER,
as Administrators Ad Prosequendum for the
Estate of SARAH A. FULLER, deceased
and, DEBORAH FULLER, & DAVID
FULLER, Individually

                              Plaintiff(s)

v.

VIVIENNE MATALON, M.D., TLC
HEALTHCARE 2, LLC, INSYS
THERAPEUTICS, INC., LINDEN CARE,
LLC INC., JOHN DOE, 1-10 (fictitious),
ABC CORPORATION 1-10(fictitious),
Individually, Jointly, Severally and/or in the
Alternative
                              Defendant(s)

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION

MIDDLESEX COUNTY

DOCKET NO.: L / 859-17

*Civil Action*

**COMPLAINT AND DEMAND FOR
JURY TRIAL**

---

     Plaintiffs, Deborah Fuller & David Fuller, as Administrators Ad Prosequendum for the Estate

of Sarah A. Fuller, deceased, and Deborah Fuller and David Fuller, Individually, who currently

reside at 47 West Temple Avenue, Stratford, New Jersey, 08084, by way of complaint against

Defendants states as follows:

<u>**JURISDICTION AND VENUE**</u>

     The Court is the proper Court of Jurisdiction and Venue. All actions herein occurred in New

Jersey and the corporate defendants routinely conduct business in Middlesex County, New Jersey

giving rise to proper venue.

## PARTIES

1. Plaintiffs, Deborah Fuller & David Fuller, are the Administrators Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, who are pursuing claims on behalf of the estate as well as individually. **A true and correct copy of the Letters of Administration is attached as Exhibit "A".**

2. Decedent, Sarah A. Fuller, who was Deborah Fuller & David Fuller's daughter, resided at 47 West Temple Avenue, Stratford, New Jersey.

3. Decedent, Sarah A. Fuller, was born on November 30, 1983 and passed away on March 25, 2016 as a result of an adverse reaction to prescription drugs, fentanyl (Subsys) and alprazolam.

4. Defendant, Vivienne Matalon, M.D. ("Dr. Matalon"), is a physician licensed in New Jersey under number 25MA05359600 who had been practicing in the field of internal medicine, at her former medical practice, TLC Healthcare 2 LLC operating as TLC Healthcare , located at 2070 Springdale Road, Cherry Hill, NJ 08034. Dr. Matalon's license to practice medicine in New Jersey was suspended on October 21, 2016 indefinitely pending further proceedings as a result of her treatment and reckless prescribing of numerous powerful and lethal opioid medications to Decedent, Sarah A. Fuller as more fully set forth in the Complaint.

5. At all relevant times hereto, Dr. Matalon was engaged in the practice of medicine as an internist and more specifically the practice of pain management, of which she was not board certified, utilizing opioid/opiate medications for pain, and was obliged to bring to bear in the practice of her profession and that of pain management the professional skill, knowledge and care in accordance with reasonably safe and accepted standards of care within the medical community.

6. Defendant, TLC Healthcare 2, LLC. ("TLC"), is a New Jersey corporate/business entity that at all times relevant hereto was providing health care services for profit in the State of New Jersey which regularly engages in the practice of medicine and through its agents, principals,

servants and employees, is obliged to bring to bear the professional skill, knowledge and care required to practice pursuant to safe and accepted standards of medicine.

7.    It is believed and averred that Dr. Matalon is a majority shareholder in and principal of TLC Healthcare 2, LLC and was acting as its agent or directly for herself and the corporation while providing health care services to decedent.

8.    Plaintiffs are pursuing professional liability and other claims set forth against Dr. Matalon individually and as the  Administrators Ad Prosequendum for the Estate of Sarah Fuller. **A true and correct copy of Plaintiffs' Affidavit of Merit as to Dr. Matalon is attached as Exhibit "B".**

9.    Defendant, Insys Therapeutics, Inc., ("Insys"), is a Delaware Corporation with its principal place of business and executive offices located at 444 South Ellis Street, Chandler Arizona 85244. Insys is a pharmaceutical company that manufactures a prescription sublingual fentanyl spray with the brand name Subsys which is marketed, distributed, prescribed, sold, dispensed, administered and consumed throughout the United States, including New Jersey. At all times material hereto, Defendant Insys was acting individually and/or through its agents, servants or employees.

10.   Defendant, Linden Care, LLC, ("Linden Care"), is a corporation/ business entity licensed as an out of state pharmacy in New Jersey under license number 28RO00043100 to dispense prescription drugs in the state of New Jersey. Linden Care's principal place of business and corporate headquarters is located at 130 Crossways Park Drive, Suite 101, Woodbury, N.Y. At all times material hereto, Defendant Linden Care was acting individually and/or through its agents, servants or employees.

11.   Linden Care is a "concierge pharmacy service" specializing in filling, dispensing and shipping pain medications throughout the country via mail/commercial shipping services and Linden Care served as the, or one of the, exclusive pharmacy dispensers of Subsys for Defendant, Insys. Linden Care does not operate any physical retail pharmacies in New Jersey

and its main method of dispensing and shipping Subsys throughout the country and in New Jersey was via Federal Express.

12.     At all times relevant hereto Defendant, Linden Care, was engaged in the practice of Pharmacology, by and through its agents and employees who are obliged to bring to bear in the practice of their profession the professional skill, knowledge and care which they possessed and to pursue their profession in accordance with reasonably safe and accepted standards of Pharmacology. As deemed a healthcare provider pursuant to New Jersey law, Plaintiffs are pursuing professional liability and other claims set forth against Linden Care individually and as the Administrators Ad Prosequendum for the Estate of Sarah A. Fuller. **A true and correct copy of Plaintiffs' Affidavit of Merit at to Linden Care is attached as Exhibit "C".**

## FACTUAL CHRONOLOGY

13.     Subsys is Transmucosal Immediate-Release Fentanyl ("TIRF") and a Schedule II narcotic under the Controlled Substances Act, which is an extremely dangerous, addictive, and lethal synthetic opioid that is one hundred (100) times more powerful than morphine that was approved in 2012 by the FDA *only for* "the management of breakthrough pain in patients with cancer, 18 years or older, who were already receiving and who were already tolerant to opioid therapy for their underlying persistent cancer pain.

14.     Subsys is a liquid formation of Fentanyl to be applied under the tongue, also called a sublingual spray. Subsys is among the most potent opioids available for human use. Its effects, while practically indistinguishable from heroin or morphine, have a greater potency and a shorter duration of action. Subsys is rapidly distributed to the brain, heart, lungs, kidneys and spleen.

15.     Subsys, as a TIRF drug, was restricted by and subject to the FDA's Transmucosal Immediate-Release Fentanyl Risk Evaluation and Mitigation Strategy program ("TIRF-REMS") in order to ensure that the benefits of the drug outweighed the enormous risks

Page 4 of 38

associated with the drug, including but not limited to misuse, abuse, addiction and overdose. Consequently, the FDA required Defendant Insys to submit, and ultimately implement, a REMS strategy for Subsys called the TIRF-REMS access program.

16.    Prescribers and pharmacists/dispensers of Subsys must comply with the TIRF-REMS requirements. Under the requirements, the prescriber and dispenser must review the education materials regarding Subsys, pass a knowledge assessment and then certify that he/she understands, *inter alia,* that Subsys is *only indicated for* "the management of breakthrough pain in patients with cancer, 18 years or older, who were already receiving and who were already tolerant to opioid therapy for their underlying persistent cancer pain, that the initial dosage shall be one hundred (100) micrograms, and any subsequent increase in dosage shall only be in one hundred (100) microgram increments.

17.    As more fully discussed herein, Defendants, Insys and Linden Care have subverted, manipulated and violated the TIRF-REMS requirements in order to get the medical community to prescribe Subsys for a wide range of conditions for which Subsys was inappropriate, highly dangerous, contradicted and specifically forbidden by the FDA for Insys' financial benefit as the manufacturer and Linden Care's financial benefit as the dispenser. They have done this in Sarah Fuller's case and have done so regularly and systematically across the country.

18.    As part of the TIRF-REMS program,  healthcare professionals who engaged in prescribing Subsys were required to submit a Patient-Prescriber Agreement Form attesting that Subsys was only being prescribed for "the management of breakthrough pain in patients with cancer, who were already receiving and who were already tolerant to, around the clock opioid therapy for their underlying persistent cancer pain" and that this specific indication was fully disclosed to the patient before initiating and prescriptions for Subsys.

19.    Since the approval of Subsys in 2012, Insys has engaged in a wide-ranging, systematic, intentional, deceptive and reckless pattern and practice of marketing, promoting and selling

Subsys for *inter alia*, the treatment of pain of patients with a wide range of conditions for which Subsys was inappropriate, highly dangerous, contradicted, deadly and specifically forbidden by the FDA as further set forth herein.

20.    It is not uncommon in the medical community for drugs to be prescribed for off-label purposes; however, drug manufacturers are not legally permitted to encourage or promote the use of regulated drugs for any indications that have not been formally approved by the FDA.

21.    Insys blatantly disregarded this basic requirement as a drug manufacturer and systematically planned and successfully executed its unlawful, false, deceptive and reckless pattern and practice of marketing, promoting and selling Subsys for the treatment of pain of patients with a wide range of conditions for which Subsys was inappropriate, highly dangerous, contradicted and deadly. Plainly, Insys infiltrated the medical community with lies, misinformation, kickbacks and financial rewards which led to a large span of the medical community to prescribe Subsys for off-label indications for which there was no proven safe use.

22.    Subsys is a very expensive drug for which there was great financial benefit for Subsys to be marketed, promoted, prescribed and dispensed on a more extensive basis than for a limited population of patients suffering breakthrough pain from malignant cancer.  In this particular case, Sarah Fuller was a recipient of Medicare and Medicare was being billed as much as $24,405.37 per month for the Subsys prescriptions being provided to Ms. Fuller over a fourteen (14) month period until she died.

23.    In 2012, the first year Subsys was on the market, 4,528 prescriptions were written for Subsys resulting in sales of $14 million and by the end of 2015 this exploded to 49,063 prescriptions written and sales of $426 million, a 3200% increase. By the end of 2014, Subsys had gained a 40.2% share of the TIRF market and was the most prescribed brand name TIRF drug on the market. By the end of 2015, *over 80% of prescriptions for Subsys were written for off-*

*label unapproved indications*, persons that were not suffering from cancer and breakthrough pain that was a result of cancer.

24.    Insys achieved rapid growth through a multitude of false, fraudulent and misleading tactics. The Defendant Insys, at all times relevant hereto, employed sales representatives who were instructed to, and did, target medical prescribers who they knew treated few, if any, cancer patients and were instructed to, and did, specifically market the product for "breakthrough pain" instead of "breakthrough cancer pain" and other conditions for which the drug was not approved, indicated, safe or appropriate.

25.    Throughout its various market territories, Insys would obtain the prescribing records of primary care physicians, pain management physicians and other practitioners outside of oncology to see who was prescribing opiates for general chronic pain and then send its sales representatives to those doctors' offices to urge them, and at many times pay them kickbacks, to prescribe Subsys off-label for unapproved non-cancer general pain.

26.    As part of its campaign of spreading false and misleading information throughout the medical community about indications for which Subsys could be safely prescribed and while also misrepresenting the true dangers of the potent drugs, Insys developed its "Speakers Program" where management and sales personnel would recruit and pay physicians to hold seminars and spread its false and misleading information in order to lure unsuspecting physicians into prescribing Subsys for general pain that was not due to malignant cancer.

27.    In addition to targeting prescribers, Insys specifically instructed its sales representatives to aggressively target individual patients who were taking opioid pain medication and convince them to switch to Subsys, regardless of whether the patient had breakthrough cancer pain and regardless of whether doing so would put the health of the patient at risk.

28.    The FDA and the TIRF-REMS program required that Subsys should be used at the lowest possible dose to treat a patient's breakthrough cancer pain. Thus, when being prescribed for patients with breakthrough cancer pain, its only approved and indicated usage, Subsys was

to be commenced at 100 micrograms ("mcg") and only safely increased or "titrated" slowly and in 100 mcg increments, but only if necessary.

29.   Insys earns more money when a higher dose is prescribed, as do Insys sales representatives, whose compensation is based largely on commission. Subsys sales representatives are given an economic incentive to recommend a higher dose that is contrary to the FDA guidelines and the terms of the TIRF-REMS program.

30.   Insys intentionally encouraged and mandated its sales representatives to recommend and encourage prescribers to skip titration and prescribe a higher dose of Subsys by representing to prescribers and patients the "effective dose" to be between 600 mcg and 1600 mcg, instead of the lowest possible dose to manage the patient's pain, contrary to FDA guidelines and the mandated TIRF-REMS access program agreement/contract.

31.   Insys based commissions for its sales representatives on the overall dollar sale amount and not per unit, pushing its sales force to fall in line with its scheme of promoting and having Subsys prescribed for off-label indications at extremely dangerous dosages, knowing this would amount to a much broader market for Subsys as well as higher profits for the company while ignoring the obvious risk posed to patients, including the Decedent, Sarah A. Fuller.

32.   In furtherance of its unlawful, intentional and reckless scheme in promoting and marketing Subsys for unapproved and indications for which it was never deemed safe, Insys set up an entire department at its corporate headquarters to defraud insurers by obtaining approval and ultimate payment for Subsys that had been unlawfully prescribed for indications for which there was no approval and safe and effective treatment. This department was known as the "Insys Reimbursement Center", ("IRC") where the sole function was to gain pre-approval and ultimate payment from insurers for Subsys being prescribed for indications for which it was not approved.

33.   Insys defrauded insurers by disguising the identity and location of the IRC with the guise that the unit was actually from the prescribing doctor's office, providing false information about

patients' true diagnoses, the type of pain being treated and the patients' previous course of treatment with other opiates that had failed.  In addition, the IRC would block the phone numbers they were calling from and fraudulently and misleadingly inform insurers and pharmacy benefit managers that they were calling from the office of the practitioner.

34.    Insys provided doctors with Insys generated Prior Authorization forms which Insys would partially pre-populate with information and the prescribing doctor would then complete with patient specific information with the Prior Authorization form then going back to the IRC where the staff would do whatever it needed to secure pre-approval and payment for Subsys for unapproved indications.

35.    If Insys' IRC unit was unable to gain approval upon its first submission of the Prior Authorization for Subsys, Insys would then provide prospective patients with free product samples with the goal to get the patient dependent/addicted to Subsys so that Insys' IRC could later submit for approval and payment citing the patient's usage of Subsys.

36.    Insys was successful with its unlawful, false, deceptive and reckless scheme and pattern of marketing and promoting Subsys for unapproved off-label purposes and in deceiving the medical community to prescribe Subsys for unapproved medical conditions; however, Insys needed a pharmacy to turn a blind eye to what it was doing and dispense Subsys throughout the country and Insys' main partner to execute its scheme during the years 2012-2016 was Linden Care, LLC.

37.    As previously stated, Defendant, Linden Care, was subject to all of the terms and conditions of the TIRF-REMS access program and also certified that it knew it could only fill and dispense prescriptions for Subsys for the drug's only approved purpose, patients experiencing breakthrough pain due to malignant cancer.

38.    Linden Care also certified that it would comply with the FDA dosage instructions in that patients for whom Subsys was properly indicated would be started on a 100 mcg initial dosage and increase in dosage would then be in 100 mcg increments.

39.  According to the Controlled Substances Act and New Jersey Regulations pertaining to dispensing of controlled substances, Linden Care knew that it could not dispense Subsys or any controlled substance without physical possession of an original prescription.

40.  At all times relevant hereto, Linden Care ignored and subverted the terms and conditions of the TIRF-REMS access program, by dispensing Subsys when it knew or should have known that Sarah Fuller, did not have pain from cancer, by accepting facsimile prescriptions and dispensing Subsys upon facsimile, by knowingly dispensing an initial prescription of Subsys for Decedent at 200 mcg and then within thirty (30) days dispensing Subsys for Decedent at 600 mcg, triple the initial prescription.

41.  Despite Insys' systematic scheme and fraud as explained, as well as that of Defendant, Linden Care, Defendant, Dr. Matalon, in her own right, recklessly, wantonly and negligently disregarded her duty of care owed to her patient, Sarah Fuller by prescribing her dangerous amounts and combinations of schedule II and schedule IV narcotics, along with Subsys, without any medical justification which caused Sarah to become addicted which then led slowly and painfully to her death.

42.  Decedent, Sarah Fuller first became a patient of Dr. Matalon and her medical practice TLC Healthcare on or about August 13, 2014. The purpose of Sarah seeking a doctor/patient relationship with Dr. Matalon was for Dr. Matalon to manage the various prescription medications that Sarah was taking for her various health conditions, i.e. fibromyalgia, back pain, with the goal to reduce and limit the need for the number of medications while managing her overall heath. However, Sarah Fuller did not have cancer nor pain from cancer.

43.  At this initial consultation with Dr. Matalon, Sarah was accompanied by her parents, Deborah and David Fuller who had explicitly explained to Dr. Matalon that Sarah had been prescribed narcotic pain medications in the past and had become dependent/addicted and that Sarah had now overcome that and that narcotic pain medications were not to be part of any treatment regimen. Sarah was not taking any narcotic pain medication at the time she became

Page 10 of 38

a patient of Dr. Matalon on August 13, 2014.

44.     Despite having been advised of Sarah's prior dependency on narcotic pain medication, on October 6, 2014, Dr. Matalon began prescribing narcotic pain medication to Sarah beginning with prescriptions for Oxycodone 7.5 mg every 6 hours and Oxycontin 10 mg every 12 hours.

45.     At no time did Dr. Matalon ever attempt to develop any alternative treatment plan for Sarah that did not involve the use of narcotics or make any referrals to any specialists to develop a treatment plan to treat Sarah without the use of narcotic pain medication. From October 6, 2014 through January of 2015, without any medical explanation and justification, Dr. Matalon prescribed Sarah over three hundred (300) Oxycontin and 250 Percocet pills.

46.     On or about January 5, 2015, at a follow up office visit in her office, Dr. Matalon orchestrated a "meeting" with Sarah, Sarah's father David, Melina Ebu-Issak, a sales representative employed by Insys and herself for the purpose of convincing Sarah that Subsys would be beneficial to her for the treatment of her neck and back pain. At that time, multiple material misrepresentations were made to Sarah and her father regarding the safe and legitimate use of Subsys as well misrepresentations as to the true and serious risks associated with the drug. Neither the Insys sales representative nor Dr. Matalon informed Sarah or her father that Subsys was fentanyl and that it was only approved and indicated for patients that were experiencing breakthrough cancer pain from malignant cancer.

47.     At this January 5, 2015 "meeting" in Dr. Matalon's office, Insys succeeded with its unlawful and dangerous promotion of Subsys and Dr. Matalon recklessly acquiesced and Sarah was prescribed 200 mcg of Subsys to be sprayed under her tongue every four (4) hours. This prescription was in addition to the Percocet 7.5 mg and Oxycontin 10 mg she was already being prescribed by Dr. Matalon.

48.     Upon this January 5, 2015 visit, Dr. Matalon, as instructed by the Insys sales representative, faxed the Subsys prescription to Linden Care and Linden Care intentionally and recklessly

disregarded the law and the TIRF-REMS requirements by then dispensing a large carton of the 200 mcg Subsys which it had delivered via Federal Express to Sarah's doorstep.

49. Twenty days later, on January 26, 2015, without any explanation and medical justification, upon the urging of the Insys sales representative and in violation of the TIRF-REMS program and agreement, Sarah's Subsys prescription was tripled in strength to 600 mcg., to be taken along with the aforementioned daily doses of Percocet and Oxycontin that Dr. Matalon had been prescribing since October of 2014.

50. Defendant, Linden Care, knowingly and/or recklessly disregarded the terms and conditions of the TIRF-REMS program and filled the prescription for and dispensed the 600 mcg of Subsys and had it shipped in a large carton via Federal Express to Sarah's doorstep

51. Dr. Matalon continued the prescriptions of Subsys for Sarah, in addition to the other narcotics, every month thereafter and Linden Care on a monthly basis would accept the Subsys scripts via facsimile and then ship the Subsys via Federal Express to Sarah's doorstep.

52. On October 28, 2015, Sarah was admitted to Virtua Hospital in Voorhees, New Jersey suffering from hyper-sedation with hypoxia secondary to narcotics and sedatives. She was immediately taken off Subsys. Sarah was discharged on October 30, 2015 with instructions to discontinue all use of Subsys and to wean off Oxycontin on an outpatient basis. These medical records were immediately provided to Dr. Matalon by the attending physician at Virtua.

53. Despite being notified directly by the physicians at Virtua Hospital as to the adverse health effects Sarah was experiencing from Subsys and other drugs she was prescribing, Dr. Matalon ignored this crucial information and just continued to prescribe Subsys, Percocet, Oxycontin and Alprazolam to Sarah over the ensuing five (5) months with the last set of prescriptions written by Dr. Matalon being March 17, 2016.

54. On March 25, 2016, Sarah Fuller died due to an adverse reaction to prescription medications,

namely fentanyl (Subsys) and alprazolam, which were prescribed by Dr. Matalon and filled and dispenses by Linden Care.

## FIRST COUNT
### Negligence-Wrongful Death
**Plaintiffs, Deborah Fuller and David Fuller, as Administrator Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, and Deborah Fuller and David Fuller, Individually v. Defendants, Vivienne Matalon, M.D. and TLC Healthcare 2, LLC**

55.   Plaintiffs incorporate the previous paragraphs at length in this count as fully set forth herein at length.

56.   Defendant, Dr. Matalon, acting as the principal for TLC Healthcare, held herself out to the public and Sarah Fuller and her family as a physician who possessed the skill, knowledge and competency in providing proper and safe medical care and whom would do no harm to her patients, including Sarah Fuller.

57.   As a result of the reckless, wanton, careless and negligent actions of Dr. Matalon, Sarah Fuller became addicted to/dependent upon the Subsys, Alprazolam, and other dangerous Schedule II narcotics that were repeatedly being prescribed without medical justification and ultimately died do to an adverse reaction to fentanyl (Subsys) and alprazolam.

58.   At all times relevant hereto Dr. Matalon was subject to various New Jersey Regulations that set forth minimal standards that health care providers must follow when prescribing patients Schedule II narcotics and other controlled substances.

59.   Dr. Matalon repeatedly disregarded and violated said regulations, including but not limited to, N.J.A.C. 13:35-7.1A & N.J.A.C. 13:35.7.6, by failing to conduct appropriate and timely examinations, failing to develop an appropriate treatment plan, failing to order appropriate testing and by failing to make appropriate specialist referrals.

60.   Dr. Matalon not only violated the applicable New Jersey Regulations, she also violated the acceptable and appropriate standard of care that she owed to Sarah Fuller and she recklessly violated the TIRF-REMS access program by prescribing Subsys to Sarah whom she knew did not have cancer and breakthrough pain that emanated from cancer.

61. At the time of Decedent, Sarah A. Fuller's death, she was survived by her parents, Deborah Fuller and David Fuller and her sister, Barbara Fuller.

62. At the time of Decedent, Sarah A. Fuller's death and by reason of that wrongful death, Plaintiffs and all surviving family members and beneficiaries have suffered pecuniary losses and losses of household services and all are pursuing this applicable cause of action under and by virtue of the New Jersey Wrongful Death Statute known and designated as N.J.S.A. 2A:31-1 through 6.

63. The injuries/death sustained by Decedent, Sarah Fuller, as aforesaid, were directly and proximately caused by the negligent, careless, wanton, willful and reckless conduct of Defendants and consisted of, but is not limited to, the following:

    (a) failure to provide necessary medical information to Sarah Fuller regarding schedule II narcotic drug side effects, including the extreme danger of addiction;

    (b) prescribing dangerous, addictive and deadly combinations of Schedule II narcotics when Dr. Matalon knew that Sarah had once had a history of addiction;

    (c) failure to communicate in a timely and proper manner regarding Ms. Fuller's condition with the patient and to provide safe methods of treatment and the development of a reasonable and safe treatment plan;

    (d) failure to properly diagnose and monitor Ms. Fuller's medical condition and use of Oxycodone, Oxycontin, Percocet and Alprazolam.

    (e) failure to order appropriate blood work and diagnostic tests for Ms. Fuller;

    (f) failure to take a proper history on Ms. Fuller and obtain necessary medical records before prescribing narcotics;

    (g) failure to formulate an accurate, independent diagnosis of any health condition of Ms. Fuller that warranted the extreme and dangerous prescribing

of narcotic medications;

(h)   failure to make proper medical decisions regarding the treatment of Ms. Fuller that would not subject her to severe risk of harm;

(i)   by prescribing/dispensing unreasonable/dangerous amounts of narcotic medications and allowing representatives of the drug manufacturer to meet with and take part in the treatment of the patient.

(j)   failing to take into account prior medical conditions or risk factors before prescribing narcotic medications;

(k)   prescribing and dispensing extreme amounts of narcotic medication that would clearly cause addiction and serious side effects; and, allowing sales representatives of the drug manufacturer to influence the care and treatment of the patient,

(l)   failing to development alternative treatment regimens to reduce the usage of narcotic medication;

(m)   failing to obtain and review prior and concurrent physician records for decedent to gain any understanding of their opinions and recommended treatments;

(n)   failing to keep adequate records that should have included completing a thorough history and physical and documenting progress with treatment or lack thereof,

(o)   failing to develop a safe and effective treatment plan;

(p)   failing to refer Ms. Fuller to appropriate specialists when any treatment she was providing was not effective;

(q)   failing to perform required and necessary physical examinations throughout the course of Ms. Fuller's extended period of receiving prescriptions for narcotic medication;

(r)     failing to conform to the applicable regulations that set forth minimum standards and protocols to ensure safe prescribing of narcotic medication;

(s)     practicing a medical specialty in which Defendants were not trained and were not qualified.

(t)     by continually prescribing dangerous and escalating amounts of narcotic medication without any medical justification or explanation when it was known or it should have known that serious adverse health effects were occurring;

(u)     permitting a sales representative from Insys to met with Sarah Fuller during the doctor/patient relationship in the office and allowing the sales representative to provide false and inaccurate information about the true indication for Subsys along with false and misleading information about the true risks of Subsys

(v)     failing to wean Ms. Fuller from dangerous and deadly narcotic medications when they knew or should have known of the severe risk of harm that would result;

(w)     by prescribing multiple, powerful and dangerous respiratory suppressant drugs at the same time when Defendants knew or should have known of the severe risk of harm of said drugs shutting down the respiratory system:

(x)     by wantonly, carelessly and/or recklessly prescribing Subsys, a transmucosal immediate release spray fentanyl that was only indicated and approved for cancer patients experiencing breakthrough pain from their malignant cancer; knowing that Ms. Fuller did not have cancer, knowing the use of said drug was contraindicated, contrary to FDA requirements and posed an unreasonable risk of harm to Ms. Fuller;

(y)     negligence/recklessness/wantonness as a matter of law.

64.    On behalf of the wrongful death beneficiaries, the Administrators, Deborah Fuller and David Fuller, claims damages for the full damages allowed under the Wrongful Death Statute and all decisional law interpreting said statute.

**WHEREFORE**, Plaintiffs, Deborah Fuller and David Fuller, as Administrator Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, and Deborah Fuller and David Fuller, individually, demand damages and judgment against Defendants, Vivienne Matalon, M.D. and TLC Healthcare 2, LLC, individually, jointly severally and/or in the alternative, under the Wrongful Death Act, exclusive of pre-judgment interest, post-judgment interest, costs, counsel fees and all other damages allowable by law.

## SECOND COUNT
### Negligence-Survival Action
**Plaintiffs, Deborah Fuller and David Fuller, as Administrator Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, and Deborah Fuller and David Fuller, Individually v. Defendants, Vivienne Matalon, M.D. and TLC Healthcare 2, LLC**

65.    Plaintiffs incorporate the previous paragraphs at length in this count as fully set forth herein at length.

66.    Defendant, Dr. Matalon, acting as the principal for TLC Healthcare, held herself out to the public and Decedent as a physician who possessed the skill, knowledge and competency in providing proper and safe medical care and whom would do no harm to her patients, including Sarah Fuller.

67.    As a result of the reckless, wanton, careless and negligent actions of Dr. Matalon, Sarah Fuller became addicted to/dependent upon the Subsys, Alprazolam, and other dangerous Schedule II narcotics that were repeatedly being prescribed without medical justification and ultimately died do to an adverse reaction to fentanyl (Subsys) and alprazolam.

68.    At all times relevant hereto Dr. Matalon was subject to various New Jersey Regulations that set forth minimal standards that health care providers must follow when prescribing patients Schedule II narcotics and other controlled substances.

69.    Dr. Matalon repeatedly disregarded and violated said regulations, including but not limited

Page 17 of 38

to, N.J.A.C. 13:35-7.1A & N.J.A.C. 13:35.7.6, by failing to conduct appropriate and timely examinations, failing to develop an appropriate treatment plan, failing to order appropriate testing and by failing to make appropriate specialist referrals.

70.    Dr. Matalon not only violated the applicable New Jersey Regulations, she also violated the acceptable and appropriate standard of care that she owed to Sarah Fuller and she recklessly violated the TIRF-REMS access program by prescribing Subsys to Sarah whom she knew did not have cancer and breakthrough pain that emanated from cancer.

71.    At the time of Decedent, Sarah A. Fuller's death, she was survived by her parents, Deborah Fuller and David Fuller and her sister, Barbara Fuller.

72.    At the time of Decedent, Sarah A. Fuller's death and by reason of that wrongful death, Plaintiffs and all surviving family members and beneficiaries have suffered pecuniary losses and losses of household services and all are pursuing this applicable cause of action under and by virtue of the New Jersey Wrongful Death Statute known and designated as N.J.S.A. 2A:31-1 through 6.

73.    The injuries/death sustained by Decedent, Sarah Fuller, as aforesaid, were directly and proximately caused by the negligent, careless, wanton, willful and reckless conduct of Defendants and consisted of, but is not limited to, the following:

    (a)    failure to provide necessary medical information to Sarah Fuller regarding schedule II narcotic drug side effects, including the extreme danger of addiction;

    (b)    prescribing dangerous, addictive and deadly combinations of Schedule II narcotics when Dr. Matalon knew that Sarah had once had a history of addiction;

    (c)    failure to communicate in a timely and proper manner regarding Ms. Fuller's condition with the patient and to provide safe methods of treatment and the development of a reasonable and safe treatment plan;

(d)    failure to properly diagnose and monitor Ms. Fuller's medical condition and use of Oxycodone, Oxycontin, Percocet and Alprazolam.

(e)    failure to order appropriate blood work and diagnostic tests for Ms. Fuller;

(f)    failure to take a proper history on Ms. Fuller and obtain necessary medical records before prescribing narcotics;

(g)    failure to formulate an accurate, independent diagnosis of any health condition of Ms. Fuller that warranted the extreme and dangerous prescribing of narcotic medications;

(h)    failure to make proper medical decisions regarding the treatment of Ms. Fuller that would not subject her to severe risk of harm;

(i)    by prescribing/dispensing unreasonable/dangerous amounts of narcotic medications and allowing representatives of the drug manufacturer to meet with and take part in the treatment of the patient.

(j)    failing to take into account prior medical conditions or risk factors before prescribing narcotic medications;

(k)    prescribing and dispensing extreme amounts of narcotic medication that would clearly cause addiction and serious side effects; and, allowing sales representatives of the drug manufacturer to influence the care and treatment of the patient,

(l)    failing to development alternative treatment regimens to reduce the usage of narcotic medication;

(m)    failing to obtain and review prior and concurrent physician records for decedent to gain any understanding of their opinions and recommended treatments;

(n)    failing to keep adequate records that should have included completing a thorough history and physical and documenting progress with treatment or

lack thereof,

(o)    failing to develop a safe and effective treatment plan;

(p)    failing to refer Ms. Fuller to appropriate specialists when any treatment she was providing was not effective;

(q)    failing to perform required and necessary physical examinations throughout the course of Ms. Fuller's extended period of receiving prescriptions for narcotic medication;

(r)    failing to conform to the applicable regulations that set forth minimum standards and protocols to ensure safe prescribing of narcotic medication;

(s)    practicing a medical specialty in which Defendants were not trained and were not qualified.

(t)    by continually prescribing dangerous and escalating amounts of narcotic medication without any medical justification or explanation when it was known or it should have know that serious adverse health effects were occurring;

(u)    permitting a sales representative from Insys to met with Sarah Fuller during the doctor/patient relationship in the office and allowing the sales representative to provide false and inaccurate information about the true indication for Subsys along with false and misleading information about the true risks of Subsys

(v)    failing to wean Ms. Fuller from dangerous and deadly narcotic medications when they knew or should have known of the severe risk of harm that would result;

(w)    by prescribing multiple, powerful and dangerous respiratory suppressant drugs at the same time when Defendants knew or should have known of the severe risk of harm of said drugs shutting down the respiratory system:

      (x)     by wantonly, carelessly and/or recklessly prescribing Subsys, a transmucosal immediate release spray fentanyl that was only indicated and approved for cancer patients experiencing breakthrough pain from their malignant cancer; knowing that Ms. Fuller did not have cancer, knowing the use of said drug was contraindicated, contrary to FDA requirements and posed an unreasonable risk of harm to Ms. Fuller;

      (y)     negligence/recklessness/wantonness as a matter of law.

74.    On behalf of the wrongful death beneficiaries, the Administrators, Deborah Fuller and David Fuller, claims damages for the full damages allowed under the Wrongful Death Statute and all decisional law interpreting said statute.

75.    On behalf of the beneficiaries of decedent, Deborah Fuller and David Fuller as the Administrators Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, and Deborah A. Fuller and David Fuller, individually, claim damages for the full damages allowed under the Survival Act and all decisional law interpreting said statute for the pain, suffering, and inconvenience endured by decedent prior to death, including, but not limited to, physical pain and suffering, mental pain and suffering and the fright and mental suffering attributed to the peril leading to decedent's death.

**WHEREFORE**, Plaintiffs, Deborah Fuller and David Fuller, as Administrator Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, and Deborah Fuller and David Fuller, individually, demand damages and judgment against Defendants, Vivienne Matalon, M.D. and TLC Healthcare 2, LLC, individually, jointly severally and/or in the alternative, under the Wrongful Death Act, exclusive of pre-judgment interest, post-judgment interest, costs, counsel fees and all other damages allowable by law.

## THIRD COUNT
### Negligence-Wrongful Death
### Plaintiffs, Deborah Fuller and David Fuller, as Administrators Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, and Deborah Fuller and David Fuller, Individually v. Defendant Insys Therapeutics, Inc.

76.  Plaintiffs incorporate the previous paragraphs at length in this count as fully set forth herein at length.

77.  At the time of Decedent, Sarah A. Fuller's death, she left surviving her mother and father, Deborah Fuller and David Fuller, and her sister, Barbara Fuller.

78.  At the time of decedent, Sarah A. Fuller's death and by reason of that wrongful death, Plaintiffs and all surviving family members and beneficiaries have suffered pecuniary losses and loss of household services and all are pursuing this applicable cause of action under and by virtue of the New Jersey Wrongful Death Statute known and designated as N.J.S.A. 2A:31-1 through 6.

79.  The actions of the Defendant, Insys, as aforesaid constitute fraud, deception, misrepresentation, wantonness, negligence and gross negligence that endangered the life, safety, health and welfare of the general public and Sarah A. Fuller.

80.  The grievous injuries, pain, suffering and ultimate death of Sarah A. Fuller, were caused solely and exclusively by the negligence and other wrongful conduct of Defendant, jointly, severally and/or individually, and/or by their agents, servants, and employees.

81.  The liability of the Defendant is predicated upon individual acts and/or on principles of respondeat superior and the Defendant is liable individually, jointly, severally and/or in the alternative.

82.  The injuries/death sustained by Decedent, Sarah Fuller, as aforesaid, were directly and proximately caused by the negligent, careless, wanton, willful and reckless conduct of Defendant and consisted of, but is not limited to, the following:

    (a)  failure to provide accurate and necessary medical information to Sarah Fuller regarding drug side effects, including the extreme danger of addiction and

death;

(b)    failure to provide accurate and necessary medical information to health care providers and others to lure patients into ingesting Subsys;

(c)    Marketing and selling Subsys, a powerful, highly addictive, highly dangerous and lethal drug to Sarah Fuller and the public, for off label use when it knew Ms. Fuller did not have any condition for which Subsys was ever intended to be used;

(d)    engaging in unlawful, deceptive, fraudulent and reckless marketing of Subsys to Sarah Fuller knowing that her use of the product was inappropriate, highly dangerous, contraindicated and forbidden by the FDA;

(e)    marketing Subsys by targeting medical providers/prescribers knowing said medical providers treated few, if any, cancer patients and specifically marketing the product for conditions other than "breakthrough cancer pain", in an effort to increase sales;

(f)    using false and deceptive marketing in an effort to affirmatively mislead the medical community, the public, health plans, as well as the Decedent, in order to increase sales;

(g)    pre-populating TIRF-REMS documents and other Insys created forms in order to mislead physicians into prescribing Subsys for unapproved indications and then obtaining payment for the off-label prescriptions;

(h)    marketing, promoting and encouraging the use Subsys to Decedent knowing she did not suffer from breakthrough cancer pain and without regard to the extreme risk to decedent's health and well being it posed;

(i)    intentionally ignoring the FDA requirement mandating the lowest possible dose for Subsys, instead promoting and encouraging a much higher and much more dangerous "effective dose" solely to maximize profits and

Page 23 of 38

commissions.

(j)      mandating and encouraging its salespersons to interfere with the doctor/patient relationship and personally meet with patients, including Sarah Fuller, and making material misrepresentations in regard to the sole indication for Subsys and the true risks associated with the drug;

(k)      paying kickbacks and other financial incentives to physicians in its speakers program in order to have those paid speakers promote its false and misleading information about the proper indications for Subsys and its true risks in order to persuade the medical community to prescribe Subsys;

(l)      fraudulently providing assistance to patients, physicians and pharmacies in obtaining preauthorization and approval from Medicare and insurance companies for payment of Subsys for the treatment of off label conditions for which it is neither indicated nor safe..

(m)      failing to warn Ms. Fuller of the true risks of Subsys and that it was never proven safe for non-cancer related pain;

(n)      negligence/recklessness/wantonness as a matter of law.

83.    On behalf of the beneficiaries of decedent, Deborah Fuller and David Fuller, as the Administrators Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, and Deborah Fuller and David Fuller, individually, claim damages for the full damages allowed under the Wrongful Death Act and all decisional law interpreting said statute for the pain, suffering, and inconvenience endured by decedent prior to death, including, but not limited to, physical pain and suffering, mental pain and suffering and the fright and mental suffering attributed to the peril leading to decedent's death.

**WHEREFORE,** Plaintiffs, Deborah Fuller and David Fuller, as Administrator Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, and Deborah Fuller and David Fuller, individually, demand damages and judgment against Defendant, Insys Therapeutics, Inc., under the

Wrongful Death Act, exclusive of pre-judgment interest, post-judgment interest, costs, counsel fees and all other damages allowable by law.

## FOURTH COUNT
### Negligence-Survival Action
### Plaintiffs, Deborah Fuller and David Fuller, as Administrator Ad Prosequendum for the Estate of Sarah A. Fuller, and Deborah Fuller and David Fuller, individually, Defendant Insys Therapeutics, Inc.

84.  Plaintiffs incorporate the previous paragraphs at length in this count as fully set forth herein at length.

85.  At the time of Decedent, Sarah A. Fuller's death, she left surviving her mother and father, Deborah Fuller and David Fuller, and her sister, Barbara Fuller.

86.  At the time of decedent, Sarah A. Fuller's death and by reason of that wrongful death, Plaintiffs and all surviving family members and beneficiaries have suffered pecuniary losses and loss of household services and all are pursuing this applicable cause of action under and by virtue of the New Jersey Wrongful Death Statute known and designated as N.J.S.A. 2A:31-1 through 6.

87.  The actions of the Defendant, Insys, as aforesaid constitute fraud, deception, misrepresentation, wantonness, negligence and gross negligence that endangered the life, safety, health and welfare of the general public and Sarah A. Fuller.

88.  The grievous injuries, pain, suffering and ultimate death of Sarah A. Fuller, were caused solely and exclusively by the negligence and other wrongful conduct of Defendant, jointly, severally and/or individually, and/or by their agents, servants, and employees.

89.  The liability of the Defendant is predicated upon individual acts and/or on principles of respondeat superior and the Defendant is liable individually, jointly, severally and/or in the alternative.

90.  The injuries/death sustained by Decedent, Sarah Fuller, as aforesaid, were directly and proximately caused by the negligent, careless, wanton, willful and reckless conduct of Defendant and consisted of, but is not limited to, the following:

(a)  failure to provide accurate and necessary medical information to Sarah Fuller regarding drug side effects, including the extreme danger of addiction and death;

(b)  failure to provide accurate and necessary medical information to health care providers and others to lure patients into ingesting Subsys;

(c)  marketing and selling Subsys, a powerful, highly addictive, highly dangerous and lethal drug to Sarah Fuller for off label use when it knew Ms. Fuller did not have any condition for which Subsys was ever intended to be used;

(d)  engaging in unlawful, deceptive, fraudulent and reckless marketing of Subsys to Sarah Fuller and the public knowing that her use of the product was inappropriate, highly dangerous, contraindicated and forbidden by the FDA;

(e)  Marketing Subsys by targeting medical providers/prescribers knowing said medical providers treated few, if any, cancer patients and specifically marketing the product for conditions other than "breakthrough cancer pain", in an effort to increase sales;

(f)  using false and deceptive marketing in an effort to affirmatively mislead the medical community, the public, health plans, as well as the Decedent, in order to increase sales;

(g)  pre-populating TIRF-REMS documents and other Insys created forms in order to mislead physicians into prescribing Subsys for unapproved indications and then obtaining payment for the off-label prescriptions;

(h)  marketing, promoting and encouraging the use Subsys to Decedent knowing she did not suffer from breakthrough cancer pain and without regard to the extreme risk to decedent's health and well being it posed;

(i)  intentionally ignoring the FDA requirement mandating the lowest possible dose for Subsys, instead promoting and encouraging a much higher and much

more dangerous "effective dose" solely to maximize profits and commissions.

(j)    mandating and encouraging its salespersons to interfere with the doctor/patient relationship and personally meet with patients, including Sarah Fuller, and making material misrepresentations in regard to the sole indication for Subsys and the true risks associated with the drug;

(k)    paying kickbacks and other financial incentives to physicians in its speakers program in order to have those paid speakers promote its false and misleading information about the proper indications for Subsys and its true risks in order to persuade the medical community to prescribe Subsys;

(l)    fraudulently providing assistance to patients, physicians and pharmacies in obtaining preauthorization and approval from Medicare and insurance companies for payment of Subsys for the treatment of off label conditions for which it is neither indicated nor safe..

(m)    failing to warn Ms. Fuller of the true risks of Subsys and that it was never proven safe for non-cancer related pain;

(n)    negligence/recklessness/wantonness as a matter of law.

91.    On behalf of the beneficiaries of decedent, Deborah Fuller and David Fuller, as the Administrators Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, and Deborah Fuller and David Fuller, individually, claim damages for the full damages allowed under the Wrongful Death Act and all decisional law interpreting said statute for the pain, suffering, and inconvenience endured by decedent prior to death, including, but not limited to, physical pain and suffering, mental pain and suffering and the fright and mental suffering attributed to the peril leading to decedent's death.

**WHEREFORE**, Plaintiffs, Deborah Fuller and David Fuller, as Administrator Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, and Deborah Fuller and David Fuller,

individually, demand damages and judgment against Defendant, Insys Therapeutics, Inc., exclusive of pre-judgment interest, post-judgment interest, costs, counsel fees and all other damages allowable by law.

**FIFTH COUNT**
**Negligence-Wrongful Death**
**Plaintiffs, Deborah Fuller and David Fuller, as Administrator Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, and Deborah Fuller and David Fuller, Individually v. Defendant, Linden Care, LLC**

92.    Plaintiffs incorporate the previous paragraphs at length in this count as fully set forth herein at length.

93.    At the time of Decedent, Sarah A. Fuller's death, she left surviving her mother and father, Deborah Fuller and David Fuller, and her sister, Barbara Fuller.

94.    At the time of decedent, Sarah A. Fuller's death and by reason of that wrongful death, Plaintiffs and all surviving family members and beneficiaries have suffered pecuniary losses and loss of household services and all are pursuing this applicable cause of action under and by virtue of the New Jersey Wrongful Death Statute known and designated as N.J.S.A. 2A:31-1 through 6.

95.    The actions of the Defendant, Linden Care, as aforesaid constitute fraud, deception, misrepresentation, wantonness, negligence and gross negligence that endangered the life, safety, health and welfare of the general public and Sarah A. Fuller.

96.    The grievous injuries, pain, suffering and ultimate death of Sarah A. Fuller, were caused solely and exclusively by the negligence and other wrongful conduct of Defendant, jointly, severally and/or individually, and/or by their agents, servants, and employees.

97.    The liability of the Defendant is predicated upon individual acts and/or on principles of respondeat superior and the Defendant is liable individually, jointly, severally and/or in the alternative.

98.    The injuries/death sustained by Decedent, Sarah Fuller, as aforesaid, were directly and proximately caused by the negligent, careless, wanton, willful and reckless conduct of

Defendant and consisted of, but is not limited to, the following:

(a)    manipulation and subversion of the TIRF-REMS access program by falsely certifying that it knew Subsys was only indicated for breakthrough pain as a result of malignant cancer and that was the only medical condition for which it would dispense Subsys knowingly causing a serious risk or harm and death;

(b)    assisting Insys with its scheme of marketing, promoting and encouraging the medical community to prescribe Subsys for unapproved indications by ensuring Insys that it would fill and dispense and ultimately did fill and dispense hundreds of thousand of off-label prescriptions for Subsys throughout the country, including those for Sarah Fuller;

(c)    violating New Jersey regulations regarding the dispensing of a schedule II narcotic by accepting prescriptions for Subsys via facsimile and dispensing upon the receipt of that faxed prescription;

(d)    violating FDA prescribing/describing requirements for Subsys as well as the TIRF-REMS access program by filling an dispensing an initial prescription of Subsys at 200 mcg for Sarah Fuller;

(e)    violating FDA prescribing/describing requirements for Subsys as well as the TIRF-REMS access program by filling an dispensing the second prescription of Subsys for Sarah Fuller for 600 mcg, triple the initial prescription that it dispenses less than one month earlier;

(f)    directly knowing or should have known that it was regularly filling and dispensing prescriptions for Subsys for unapproved indications, including Sarah Fuller which it knew caused a serious risk of harm and death;

(g)    knowing that the amount of Subsys that it was dispensing throughout the country from 2012-2016 increased drastically and that the increase was due to prescriptions being written off-label for non-cancer related pain, including

those for Sarah Fuller;

(h) failing to train, oversee and manage its employees for the proper, safe and lawful dispensing of Subsys for its patients throughout the country, including Sarah Fuller.

(i) negligence/recklessness/wantonness as a matter of law.

99. On behalf of the beneficiaries of decedent, Deborah Fuller and David Fuller, as the Administrators Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, and Deborah Fuller and David Fuller, individually, claim damages for the full damages allowed under the Wrongful Death Act and all decisional law interpreting said statute for the pain, suffering, and inconvenience endured by decedent prior to death, including, but not limited to, physical pain and suffering, mental pain and suffering and the fright and mental suffering attributed to the peril leading to decedent's death.

WHEREFORE, Plaintiffs, Deborah Fuller and David Fuller, as Administrator Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, and Deborah Fuller and David Fuller, individually, demand damages and judgment against Defendant, Linden Care, LLC under the Wrongful Death Act, exclusive of pre-judgment interest, post-judgment interest, costs, counsel fees and all other damages allowable by law.

### SIXTH COUNT
### Negligence-Survival Action
### Plaintiffs, Deborah Fuller and David Fuller, as Administrator Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, and Deborah Fuller and David Fuller, Individually v. Defendants, Linden Care, LLC

100. Plaintiffs incorporate the previous paragraphs at length in this count as fully set forth herein at length.

101. Plaintiffs, Deborah Fuller and David Fuller, as Administrators Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, and Deborah Fuller and David Fuller, Individually bring this Survival Action on behalf of the Estate of Sarah A. Fuller, deceased under and by virtue of N.J.S.A. 2A:31-4.

Page 30 of 38

102.   As a result of the acts and omissions of Defendants, the negligence, recklessness and wantonness of Defendants, Plaintiff's decedent was caused significant pain and suffering and anguish for a lengthy period before her death resulting in the entitlement to damages by said beneficiaries under the Survival Act.

103.   The injuries/death sustained by decedent, as aforesaid, were directly and proximately caused by the negligent, careless, wanton, willful and reckless conduct of Defendant and consisted of, but is not limited to, the following:

   (a)   manipulation and subversion of the TIRF-REMS access program by falsely certifying that it knew Subsys was only indicated for breakthrough pain as a result of malignant cancer and that was the only medical condition for which it would dispense Subsys;

   (b)   assisting Insys with its scheme of marketing, promoting and encouraging the medical community to prescribe Subsys for unapproved indications by ensuring Insys that it would fill and dispense and ultimately did fill and dispense hundreds of thousand of off-label prescriptions for Subsys throughout the country, including those for Sarah Fuller knowing causing a serious risk or harm and death;

   (c)   violating New Jersey regulations regarding the dispensing of a schedule II narcotic by accepting prescriptions for Subsys via facsimile and dispensing upon the receipt of that faxed prescription;

   (d)   violating FDA prescribing/describing requirements for Subsys as well as the TIRF-REMS access program by filling an dispensing an initial prescription of Subsys at 200 mcg for Sarah Fuller;

   (e)   violating FDA prescribing/describing requirements for Subsys as well as the TIRF-REMS access program by filling an dispensing the second prescription of Subsys for Sarah Fuller for 600 mcg, triple the initial prescription that it

dispenses less than one month earlier;

(f)     directly knowing or should have known that it was regularly filling and dispensing prescriptions for Subsys for unapproved indications, including Sarah Fuller which subject her to serious risk of harm and death;

(g)     knowing that the amount of Subsys that it was dispensing throughout the country from 2012-2016 increased drastically and that the increase was due to prescriptions being written off-label for non-cancer related pain, including those for Sarah Fuller;

(h)     failing to train, oversee and manage its employees for the proper, safe and lawful dispensing of Subsys for its patients throughout the country, including Sarah Fuller.

(i)     negligence/recklessness/wantonness as a matter of law.

104.     On behalf of the beneficiaries of decedent, Deborah Fuller and David Fuller as the Administrators Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, and Deborah A. Fuller and David Fuller, individually, claim damages for the full damages allowed under the Survival Act and all decisional law interpreting said statute for the pain, suffering, and inconvenience endured by decedent prior to death, including, but not limited to, physical pain and suffering, mental pain and suffering and the fright and mental suffering attributed to the peril leading to decedent's death.

**WHEREFORE,** Plaintiffs, Deborah Fuller and David Fuller, as Administrator Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, and Deborah Fuller and David Fuller, individually, demand damages and judgment against Defendant, Linden Care, LLC, under the Wrongful Death Act, exclusive of pre-judgment interest, post-judgment interest, costs, counsel fees and all other damages allowable by law.

**SEVENTH COUNT**
**COMMON LAW FRAUD**
**Deborah Fuller and David Fuller, as Administrators of the Estate of Sarah A. Fuller,**
**deceased, and Deborah Fuller and David Fuller individually v. Insys Therapeutics, Inc.**
**and Linden Care, LLC**

105.   Plaintiffs incorporate the previous paragraphs at length in this count as fully set forth herein.

106.   The Defendants Insys and Linden Care, independently and collectively, falsely and fraudulently represented to the public and specifically to Sarah Fuller and her family that the drug, Subsys, was indicated and found to be safe and effective for the treatment of non-cancer pain when they knew it was only approved by the FDA for the very limited purpose of treating patients with breakthrough cancer pain. The Defendants colluded to in having Subsys prescribed and dispensed regularly and systematically throughout the country for people that did not have cancer and for which Subsys was extremely deadly and dangerous, including Sarah Fuller.

107.   The representations made by Defendants were, in fact, false and when the Defendants made their representations they knew they were false and they willfully, wantonly, and recklessly disregarded the extreme danger of causing serious illness, addiction and death to non-cancer patients who used Subsys. Moreover, these false representations were carried out through Defendants' manipulation, subversion and violation of the TIRF-REMS access program.

108.   The false representations made by Defendants were carried out with the intent to defraud and deceive the Plaintiffs, the decedent, and the public for the sole purpose of increasing prescriptions, sales and consumption of Subsys to increase Defendant's profits, all of which evidenced a callous, willful, reckless and depraved indifference to the health, safety and welfare of the decedent, Sarah A. Fuller and the public.

109.   At the time the misrepresentations were made the by Defendants, the Plaintiffs herein and the decedent, Sarah A. Fuller, were unaware of the falsity of those representations and reasonably relied upon the false representations of defendants.

110.   In reliance upon the Defendant's false representations the decedent, Sarah A. Fuller, was

induced into using Subsys for the treatment of a condition for which it was not approved and clearly was not safe, believing it to be safe, appropriate and effective.

111.   Had the Decedent, Sarah A. Fuller, known the true facts that Subsys was only approved for treatment of patients with breakthrough cancer pain and that Subsys was never tested, proven to be effective, safe nor approved by the FDA for her condition, she would never have used the drug.

112.   The Defendants' wrongful conduct constitutes fraud, deceit and was committed and perpetrated willfully, wantonly, and purposely upon Decedent, Sarah A. Fuller.

113.   As a direct result of Defendants fraudulent conduct, Decedent, Sarah A. Fuller, was caused grievous sickness, suffering, addiction and untimely death.

   **WHEREFORE**, Plaintiffs, Deborah Fuller and David Fuller, as Administrator Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, and Deborah Fuller and David Fuller, individually, demand punitive damages and judgment against Defendants, Insys Therapeutics, Inc and Linden Care LLC, individually, jointly severally and/or in the alternative exclusive of pre-judgment interest, post-judgment interest, costs, counsel fees and all other damages allowable by law.

## EIGHTH COUNT
## NEGLIGENT MISREPRESENTATION
### Plaintiffs, Deborah Fuller and David Fuller, as Administrator Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, and Deborah Fuller and David Fuller, Individually v. Insys Therapeutics, Inc. and Linden Care, LLC

114.   Plaintiffs incorporate the previous paragraphs at length in this count as fully set forth herein at length.

115.   The Defendants herein had a duty to accurately and truthfully represent to the public and the Decedent herein that Subsys was only approved to be safe and effective for the treatment of patients with cancer pain from malignancies and that it was not approved by the FDA as safe and effective for the treatment of non-cancer pain and it would not be marketed and dispensed otherwise.

116. The Defendants, through the TIRF-REMS access program and certifications, agreed and certified that Subsys would only be prescribed and dispensed solely for patients suffering breakthrough pain due to malignant cancer; yet the Defendants manipulated and violated said provisions and requirements.

117. The representations made by the Defendants through their multiple unlawful and fraudulent acts were, in fact, false. Decedent, Sarah Fuller, reasonably relied upon Defendants' negligent misrepresentations which led her to unknowingly consuming Subsys for which it was not indicated for her and instead posed extreme risk or harm and death.

118. The Defendants failed to exercise reasonable and ordinary care in making their representations to the public and the Decedent concerning Subsys while they were marketing, promoting, selling and distributing, and dispensing Subsys to the public and the Decedent and the Defendants' intent and purpose was for the medical community to prescribe Subsys and consumers to ingest Subsys for medical conditions that were unapproved and for which the drug was unsafe and ineffective all for their financial benefit..

119. As a foreseeable, direct and proximate result of the negligent misrepresentations of the Defendants to the medical community, the general public, and the Decedent, the Decedent relied upon said misrepresentations and believed it was to take Subsys for her non-cancer pain.

120. The grievous suffering, injuries and death of Sarah A. Fuller were proximately caused by and/or contributed to by the negligence, fraud, wantonness, recklessness and intentional wrongful behavior of the defendants, their agents, servants and/or employees, and were due in no manner whatsoever to any act or failure to act on the part of Sarah A. Fuller.

**WHEREFORE,** Plaintiffs, Deborah Fuller and David Fuller, as Administrator Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, and Deborah Fuller and David Fuller, individually, demand damages, compensatory and punitive damages, and judgment against Defendants, Insys Therapeutics, Inc and Linden Care Comprehensive Pharmaceutical Services, Inc.,

individually, jointly severally and/or in the alternative, exclusive of pre-judgment interest, post-judgment interest, costs, counsel fees and all other damages allowable by law.

### NINTH COUNT
**Plaintiffs, Deborah Fuller and David Fuller, as Administrator Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, and Deborah Fuller and David Fuller, Individually v. Defendants John Doe 1-10 (fictitious) and ABC Corporation 1-10 (fictitious)**

121.  Plaintiffs incorporate the previous paragraphs in this count as fully set forth herein at length and are asserting all causes of action that were previously stated against all of the specifically named Defendant under each and every count.

122.  Defendant John Doe 1-10 (fictitious) are the fictitious names of physicians, doctors or other health care providers, duly licensed to practice in the state of New Jersey, who, at all times relevant hereto, were engaged in the practice of their profession and provided medical services to Sarah A. Fuller for profit including but not limited to issuing prescriptions for narcotics and other dangerous drugs.

123.  Defendant, ABC Corporation 1-10 (fictitious), is a New Jersey corporate/business entity, professional association, partnership and/or medical practice that at all times relevant hereto was providing health care services and/or pharmaceutical services for profit in the State of New Jersey.  ABC Corporation 1-10 provided health care services to further it's business interests.

**WHEREFORE**, Plaintiffs, Deborah Fuller and David Fuller, as Administrator Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, and Deborah Fuller and David Fuller, individually, demand damages and judgment against Defendants, John Doe 1-10 (fictitious) and ABC Corporation 1-10 (fictitious) individually, jointly severally and/or in the alternative, under the Wrongful Death Act, exclusive of pre-judgment interest, post-judgment interest, costs, counsel fees and all other damages allowable by law.

### TENTH COUNT
### PUNITIVE DAMAGES
**Plaintiffs, Deborah Fuller and David Fuller, as Administrator Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, and Deborah Fuller and David Fuller, Individually v. Vivienne Matalon, M.D., TLC Healthcare 2, LLC, Insys Therapeutics, Inc. and Linden Care, LLC., Inc., John Doe # 1-10 (fictitious) and ABC Corporation #1-10 (fictitious)**

124.   Plaintiffs incorporate the previous paragraphs at length in this count as though fully set forth herein at length.

125.   Defendants knew or should have known that their actions with the marketing, prescribing and dispensing of Subsys posed a significant risk of serious health problems and/or death and their actions, individually and collectively were wanton and reckless and in wilful disregard to the rights and safety of Decedent, Sarah A. Fuller.

126.   As a result of the reckless and wanton acts and omissions of Defendants, individually and collectively, Decedent, Sarah Fuller, was caused significant pain and suffering and anguish for a lengthy period of time which then ultimately led to her death.

127.   The injuries/death sustained by Decedent, Sarah Fuller, as aforesaid, were directly and proximately caused by the wanton, wilful and reckless conduct of Defendants as fully set forth in detail throughout Plaintiff's Complaint.

**WHEREFORE**, Plaintiffs, Deborah Fuller and David Fuller, as Administrator Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, and Deborah Fuller and David Fuller, individually, demand damages and judgment against Defendants, Vivienne Matalon, M.D., TLC Healthcare, Insys Therapeutics, Inc, Linden Care, LLC., John Doe M.D., 1-10, (fictitious) ABC Medical Group 1-10, (fictitious) ABC Corporation 1-10, (fictitious), for punitive damages, together with interest, attorney's fees and costs of suit as well as any other damages the court deems just and are allowable by law.

### DESIGNATION OF TRIAL COUNSEL

Pursuant to the provision of R.4:25-4, notice is given that RICHARD J. HOLLAWELL, ESQUIRE and MARK C. DEWLAND are hereby designated as trial counsel.

## DEMAND FOR JURY

PLEASE TAKE NOTICE that the Plaintiffs hereby demands a jury trial as to all of the within issues.

## DEMAND FOR DISCOVERY OF INSURANCE COVERAGE

Pursuant to *R.* 4:10-2(b), demand is hereby made that you disclose to the undersigned whether there are any insurance agreements or policies under which any person or entity carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in this action or to indemnify or reimburse for payments made to satisfy the judgment.

If so, provide to the undersigned a copy of each policy or agreement, or in the alternative state, under oath or certification; (a) policy number; (b) name and address of insurer; ©) inception and expiration dates; (d) names and addresses of all persons/entities covered; (e) personal injury limits; (f) property damage limits; (g) medical payment limits.

## DEMAND FOR DISCOVERY

Pursuant to R..4:17-1(b), demand is hereby made for each Defendant to provide answers to Form C and Form C(3) Interrogatories of Appendix II of the New Jersey Court Rules.

## NOTICE OF NO OTHER ACTION

Pursuant to **Rule 4:5-1** the Plaintiffs' attorney hereby certifies to the best of his knowledge that there is an Order to Show Cause seeking, inter alia, presuit discovery in this matter pending in Camden County Superior Court, Docket No: L-870-17, that will be rendered moot by the filing of this action.

DATED: 3/23/17

DATED: 3/23/2017

*Richard J. Hollawell*
RICHARD J. HOLLAWELL, ESQUIRE

MARK C. DEWLAND. ESQUIRE
Attorneys for Plaintiffs, Deborah Fuller and David Fuller, as Administrator Ad Prosequendum for the Estate of Sarah A. Fuller, deceased, and Deborah Fuller and David Fuller, Individually

Page 38 of 38

EXHIBIT A

**Docket No.:** 2016-1491

# State of New Jersey
# Camden County Surrogate's Court

In the matter of the Estate

Sarah A Fuller , Deceased

### LETTERS ADMINISTRATION
### AD PROSEQUENDUM

I, Michelle A. Gentek-Mayer, Surrogate of Camden County and State of New Jersey, do hereby certify that on September 29, 2016, administration ad prosequendum of decedent, who died intestate, late of the County of Camden and State of New Jersey was granted by me to Deborah S Fuller and David C Fuller of said County of Camden who is duly authorized to bring an action, institute a proceeding or make a claim in his name as such administrator ad prosequendum as is the statute such case provided.



WITNESS my hand and seal of office on

September 29, 2016

Surrogate

# EXHIBIT B

## AFFIDAVIT OF MERIT

I, Kevin E. Bell, M.D., being of full age, sound mind and being duly sworn upon his oath, according to law, hereby deposes and says:

1.      I am a medical doctor specializing in Internal Medicine and licensed to practice medicine in the State of New Jersey. The opinions which I am rendering in this Affidavit of Merit relate to substantially the same areas of medicine in which I practice.

2.      I have reviewed the medical records and pharmacy records regarding the treatment rendered to Sarah Ann Fuller by Vivienne I. Matalon, M.D. and other providers at TLC Health Care.

3.      It is my opinion to a reasonable degree of medical certainty that, more likely than not, Vivienne I. Matalon, M.D. and TLC Health Care failed to use such care as a reasonably prudent and careful health care provider would have used under similar or same circumstances, as she was negligent (she failed to use that level of skill and learning which is ordinarily used under the same or similar circumstances by members of Dr. Vivienne I. Matalon's profession) and was actually reckless in the over-prescribing of narcotic medications without performing thorough physical examinations and without objective evidence to support the prescribing of the narcotic medications and for failing to implement a careful and cognizable treatment plan as required for the ongoing prescribing of Schedule II narcotics.

4.      It is my opinion to a reasonable degree of medical certainty that Sarah Ann Fuller was caused to be severely ill with addiction to the various narcotics being improperly and clearly over-prescribed by Vivienne I. Matalon, M.D. and TLC Health Care. Moreover, it is my opinion that the over-prescribing of narcotics by Vivienne I. Matalon, M.D. and TLC Health Care was a significant factor that led to the ultimate demise of Sarah Ann Fuller.

5.      I certify that the above statements made by me are true. I am aware that if any of the

above statements made by me are willfully false, I am subject to punishment.

_____

KEVIN E. BELL, M.D.



STATE OF NEW JERSEY,
COUNTY OF  Somerset   SS.:

I CERTIFY that on  28th of Nov, 2016,  Kevin E Bell MD    personally came before
me and acknowledged under oath, to my satisfaction, that this person (or if more than one, each
person):
        (a)  is named in and personally signed this document; and
        (b)  signed, sealed and delivered this document as his or her act and deed.

_____

MARIETTA A. DEALAMAN
NOTARY PUBLIC OF NEW JERSEY
I.D. # 50003472
My Commission Expires 9/18/2019

EXHIBIT C

## CERTIFICATE OF MERIT

I, Joel Shuster, RPh, PharmD, being of full age, sound mind and being duly sworn upon his oath, according to law, hereby deposes and says:

1.     I am a Doctor of Pharmacy and was Board Certified in Psychiatric Pharmacy for fourteen years. The opinions which I am rendering in this Affidavit of Merit relate to substantially the same areas of pharmacy in which I am licensed.

2.     I have reviewed the medical records and pharmacy records regarding the medications prescribed to Sarah Ann Fuller by Vivienne I. Matalon, M.D. which were dispensed by Linden Care Pharmacy, 130 Crossways Park Drive, Suite 101, Woodbury, NY 11797.

3.     It is my opinion to a reasonable degree of pharmaceutical certainty that pharmacists at Linden Care Pharmacy, 130 Crossways Park Drive, Suite 101, Woodbury, NY were negligent and reckless in their duties as pharmacists while dispensing medications to Sarah Ann Fuller and failed to adhere to the acceptable standards of care for pharmacists as well as applicable New Jersey Regulations that govern the safe dispensing of prescription medication.

4.     It is my opinion to a reasonable degree of pharmaceutical certainty that Sarah Ann Fuller's death from a drug overdose was a direct result of the over-dispensing of narcotics to Sarah Ann Fuller by pharmacists at Linden Care Pharmacy, 130 Crossways Park Drive, Suite 101, Woodbury, NY. Therefore it is my opinion that the over-dispensing of narcotics by pharmacists at Linden Care Pharmacy, 130 Crossways Park Drive, Suite 101, Woodbury, NY was the cause or a contributing factor to the death of Sarah Ann Fuller.

5.     That such failure to use reasonable care directly caused or directly contributed to cause damages and ultimately death to Sarah Ann Fuller.

6.      I certify that the above statements made by me are true. I am aware that if any of

the above statements made by me are willfully false, I am subject to punishment.


JOEL SHUSTER, RPh, PharmD


STATE OF FLORIDA,
COUNTY OF *Palm Beach*     SS.:

I CERTIFY that on *October 26* , 2016, *Joel Shuster*          personally      came
before me and acknowledged under oath, to my satisfaction, that this person (or if more than one,
each person):
     (a)  is named in and personally signed this document; and
     (b)  signed, sealed and delivered this document as his or her act and deed.

Post a Legal Professional Job (http://corporate.findlaw.com/corporate.html (http://www.findlaw.com/)

Register (http://login.findlaw.com/scripts/register?dest=http://corporate.findlaw.com/corporate-governance/connecticut-uninsured-and-underinsured-motorist-coverage-issues.html) | Login (http://login.findlaw.com/scripts/login?)

Search FindLaw        [Search]

CASES & CODES (HTTP://CASELAW.FINDLAW.COM)    PRACTICE MANAGEMENT (HTTP://PRACTICE.FINDLAW.COM)

Forms (http://forms.lp.findlaw.com)    Lawyer Marketing (http://www.lawyermarketing.com)    Corporate Counsel (http://corporate.findlaw.com/)

**Want to retire comfortably?**
If you have a $500,000 portfolio, download the guide by *Forbes* columnist and money manager Ken Fisher's firm. It's called *The Definitive Guide to Retirement Income*. Even if you have something else in place right now, it *still* makes sense to request your guide! **Click Here To Download Your Guide!**    FISHER INVESTMENTS®

FindLaw (http://lp.findlaw.com)    Corporate Counsel (/)
Corporate Governance (http://corporate.findlaw.com/corporate-governance/)
Connecticut Uninsured and Underinsured Motorist Coverage Issues

# Connecticut Uninsured and Underinsured Motorist Coverage Issues

50          2759



Ask about same-day appointments.
**Call 856-624-4319**
weekdays before noon.
*Most calls will result in a same-day appointment.
SMS Salem Medical Group

**FindLaw Career Center**

Select a Job Title
Attorney
Corporate Counsel
Academic
Judicial Clerk
Summer Associate
Intern
Law Librarian

[Search Jobs]    Post a Job (http://www.indeed.com/hire?indpubnum=7912446341545586) | Careers Home (http://careers.findlaw.com)

View More (http://careers.findlaw.com/)

## 1. COVERAGE

### 1. Persons Covered

Since the uninsured motorist legislation and regulations do not specifically define an insured who is entitled to coverage under the uninsured motorist provisions of the policy, public policy mandates that an insurer provide uninsured motorist benefits to any person defined as an insured under the liability portion of the policy. Middlesex Ins. Co. v. Quinn, 225 Conn. 257 (1993).

The typical uninsured motorist policy provides coverage for the following classes of persons: (1) the named insured and while residents of the same household as the named insured, the relatives and spouse of the named insured; (2) anyone occupying a vehicle insured by the liability coverage; and (3) any other person entitled to recover due to bodily injuries sustained by a person insured under (1) or (2) above.

1. **Coverage for the named insured, resident spouse and relatives**

    1. The named insured is provided with the most comprehensive coverage.

    2. The spouse and relatives of the named insured are covered only if they reside in the same household as the named insured.

        1. Resident relatives of a named insured owning their own vehicle, who are injured by an uninsured motorist while occupying their own vehicle, may be excluded from uninsured motorist coverage under the named insured's policy. Middlesex Ins. Co. v. Castellano, 225 Conn. 339 (1993); Middlesex Ins. Co. v. Quinn, 225 Conn. 257 (1993); Middlesex Ins. Co. v. Rady, 34 Conn. App. 679 (1994); Stewart v. Middlesex Ins. Co., 38 Conn. App. 194 (1995).

    3. Residency within the same household depends upon the particular factual circumstances involved. Two elements are primary in determining this: whether the facts sufficiently establish (1) the claimant had a close family-type relationship with the inhabitants of the household; and (2) the claimant actually lived in the household. Middlesex Mutual Assurance Co. v. Walsh, 218 Conn. 681 (1991); Griffith v. Security Ins. Co., 167 Conn. 450 (1975); D'Addio v. Conn. Ins. Guaranty Association, 30 Conn. App. 729 (1993); Remington v. Aetna Cas. & Surety Co., 240 Conn. 309 (1997).

        1. Residency depends upon objective factors relevant to those two elements.

    4. In Remington v. Aetna Casualty & Surety Co., 35 Conn. App. 581 (1994) the court decided that, in the context of uninsured motorist coverage, the stepparent-stepchild relationship, which is based on affinity, does not terminate automatically when the marriage that created it is terminated by the death of the biological parent. Where the stepparent continues in the role of parent to the stepchild after the death of the biological parent, then the relationship of affinity continues.

    5. Coverage for employees of corporate named insureds. Depending upon the facts and circumstances of the particular case, the insertion of "family member" language in a business auto policy insuring a corporate named insured may extend coverage to natural persons. Ceci v. National Indemnity Co., 225 Conn. 165 (1993); Agosto v. Aetna Cas. & Surety Co., 239 Conn. 549 (1996); Agosto v. Aetna Cas. & Surety Co., 239 Conn. 549 (1996). Hansen v. Ohio Cas. Ins. Co., 239 Conn. 537 (1996).

        1. Such a determination is fact-intensive and depends upon the nature and size of the business; the relationship between the officers and employees; whether the listed drivers were related to the owner, etc. Ceci, supra.



Ask about same-day appointments.
**Call 856-624-4319**
weekdays before noon.
*Most calls will result in a same-day appointment.
SMS Salem Medical Group

**Open for Business**
Small Business Law newsletter.
Newsletters.FindLaw.com

**FindLaw Newsletters**
Case summaries, blogs and news in your inbox.
Newsletters.FindLaw.com

**Corporate Law Updates**
Free newsletter delivered to your inbox.
Newsletters.FindLaw.com

6. **Coverage for members of voluntary associations.**

A policy of automobile insurance issued to a voluntary association indemnifies the members of a voluntary association under the liability portion of the policy and therefore also insures them as named insureds for uninsured motorist coverage. Hartford Accident and Indemnity Co. v. Sena, 42 Conn. Sup. 336 (1993).

2. **Coverage for persons occupying an insured vehicle**

   1. Coverage for this class of persons is required by regulation. Regs. Conn. State Agency Sec. 38a-334-6(a).

   2. Occupants of a motor vehicle are not insured under the policy for liability coverage, and, without the regulation, would not be entitled to uninsured motorist coverage under the owner's policy of insurance. See Conn. Gen. Stat. Sec. 38a-335(d); Regs. Conn. State Agency Sec. 38a-334-5(d).

   3. The term "occupying" is generally defined as "in or upon or entering into or alighting from" the vehicle. Testone v. Allstate Ins. Co., 165 Conn. 126 (1973). Almeida v. Liberty Mutual Ins., 234 Conn. 817 (1995).

   4. For a person to be covered under this clause of the policy, they must be in actual physical contact with the insured vehicle at the time of the injury. Testone, supra, but see Wilson v. Security Ins. Co., 213 Conn. 532, where the claimant was not in physical contact with the insured vehicle, but the Supreme Court allowed recovery.

   5. Furthermore, the occupation of the insured vehicle must be with the permission of the named insured. A person occupying the insured vehicle without the permission of the insured is not covered under this clause. Employees Commercial Union Ins. Co. v. White, 4 CLT, No. 37, p. 11 (1978).

3. **Coverage for persons who suffer consequential damages as a result of bodily injuries sustained to an insured**

   1. This clause allows a person who incurs medical expenses on behalf of an insured, or has a cause of action for loss of consortium, to assert a claim under the uninsured motorist provisions of the policy. Smith v. Amica Mutual Ins. Co., 7 Conn. L. Rptr. No. 19, 539 (1992).

   2. A claim for loss of consortium (being derivative) falls within the per-person limit of a split limit policy and does not spring the higher per-occurrence limit of that policy. Izzo v. Colonial Penn Ins. Co. 203 Conn. 305 (1987). DeMarinis v. USAA Casualty Ins. Co. Inc., 44 Conn. App. 172 (1997).

   3. This claim would also seem to allow an insured to make a claim for bystander emotional distress under Clohessy v. Bachelor, 237 Conn. 31 (1996).

2. **Excess or Umbrella Coverage**

   1. Neither excess liability policies nor excess indemnity policies are automobile liability policies within the meaning of C.G.S. '38a-336 and, therefore, are not required to provide uninsured motorist coverage. Mass v. United States Fidelity & Guaranty Co., 222 Conn. 631 (1992); Cohn v. Pacific Employers Ins. Co., 213 Conn. 540 (1990).

   2. Some excess policies specifically provide uninsured motorist coverage in limited amounts. This fact does not convert it into an automobile liability policy. Therefore, excess policies providing limited uninsured motorist coverage need not provide uninsured motorist coverage equal to the limit of the excess coverage. Curran v. Aetna Casualty & Surety Co., 222 Conn. 657 (1992).

   3. Since the excess policy is not an automobile liability policy within the meaning of C.G.S. '38a-336, the doctrine of stacking does not apply. Curran v. Aetna Casualty & Surety Co., supra.

3. **Who Decides the Issue of Coverage?**

   1. If the policy provides for arbitration, then by statute it must include a provision for final determination of insurance coverage in the arbitration proceeding. C.G.S. '381-336(c).

   2. When the policy provides for arbitration, the insurer cannot limit the arbitrator's power to decide the coverage issue; that power is statutorily mandated. Oliva v. Aetna Casualty and Surety Co., 181 Conn. 37 (1980).

   3. Coverage issues must be arbitrated even if the coverage dispute involves an unsettled or difficult question of law. Lane v. Aetna Casualty and Surety Co., 203 Conn. 258 (1987).

   4. The arbitability of a dispute is a threshold legal question for the Court. The identifying characteristic of a coverage issue is the need to interpret the terms of the policy to determine the scope of its coverage. Wynn v. Metropolitan Property and Casualty Ins. Co., 30 Conn. App. 803 (1993); Aff=d. 228 Conn. 436 (1994).

   5. A coverage issue is one that is governed wholly by the policy language or

involves the interpretation of both a statutory and policy language or otherwise implicates the scope of coverage afforded by the terms of the policy. Wynn, supra.

6. A claimant with an uninsured motorist claim must prove the following to compel arbitration:

1. At the time of the accident the policy was in effect;

2. The policy contained an arbitration clause;

3. The claimant was in the class of persons defined as insureds in the policy;

4. The insurer has not paid the claimant's uninsured motorist claim;

5. The claimant's injuries were caused in such a manner to give rise to an uninsured motorist claim under the policy and applicable statutes;

6. There is either no other insurance or inadequate coverage to indemnify the claimant for his injuries. Gaudet v. Safeco Inc. Co., 219 Conn. 391 (1991).

7. To compel arbitration, the claimant need not prove that he would be entitled to the coverage sought. Gaudet, supra.

4. Scope of Review of Arbitration Awards

1. The scope of judicial review of an arbitration award arising from a voluntary submission is limited by the terms of the arbitration agreement and by the provisions of C.G.S. '52-418. American Universal Insurance Co. v. DelGreco, 205 Conn. 178 (1987).

1. In such cases, the Court merely examines the submission to arbitration and the award to determine whether the award conforms to the submission; the Court will review neither the evidence nor the award for errors of fact or law. American Universal Insurance Co., supra.

2. Scope of review of compulsory arbitration awards

1. Scope of review of compulsory coverage issues: Where judicial review of compulsory arbitration proceedings is undertaken under General Statutes '52-418, the reviewing court must conduct a de novo review of the interpretation and application of the law by the arbitrators to the coverage issue. De novo review is an independent review by the Court to determine if the arbitration panel's interpretation or conclusions of law

are legally and logically correct. Such review is limited to the arbitration panel's interpretation and application of the law relating to coverage. American Universal v. DelGreco, supra.

2. Scope of review of factual findings with respect to compulsory coverage issues: The appropriate standard of review for such factual findings is the substantial evidence test.

1. The substantial evidence test compels a reviewing court to determine whether the record contains substantial evidence to support the arbitration panel's factual findings and whether the panel has drawn reasonable conclusions from those facts. Chmielewski v. Aetna Casualty and Surety Co., 218 Conn. 646 (1991).

2. In order to preserve a challenge to the panel's factual findings and to ensure that the reviewing court is able to conduct an effective review, the statute requires a record of the proceedings to be preserved and made available to the Court. Chmielewski, supra.

3. Scope of review of voluntary legal and factual issues.

1. Many policies provide that the only issues to be arbitrated are: (1) The insured's right to recover damages from the owner or operator of the uninsured motor vehicle, and (2) the amount of such damages.

1. Insurers who contractually provide for the arbitration of these issues do so voluntarily and without statutory compulsion. Bodner v. USAA, 222 Conn. 480 (1991).

2. Judicial review of the arbitration decision on these issues is limited to determining whether the award conforms to the submission. Bodner v. USAA, supra.

5. Election of Lower Limits

1. Since July 1, 1984, C.G.S. '38a-336 has required that every auto policy issued or renewed after that date have uninsured motorist coverage equal to the liability coverage of the policy, unless the insured requests in writing a lesser amount.

2. The statute does not require the insurer to explain the purpose of the coverage, the advantages or disadvantages of electing a particular level of coverage.

3. All that is required for an effective election of lower limits is a writing signed by all named insureds. Nationwide Mutual Ins. Co. v. Pasion, 219 Conn. 764 (1992).

1. However, when the co-owner, who signed the Reduction in Coverage form, was the party subsequently injured, such reduction was affected as

558 (1997); Aff=d in part 245 Conn. 710 (1998).

4. **Public Act 93-297**
   1. The election of lower limits has been transformed by Public Act 93-297 into a waiver.
   2. Waiver is a voluntary relinquishment of a known right. It requires the party relinquishing the right to be made aware of it and to decide knowingly and intelligently to forego it. Harlach v. Metropolitan Property and Liability Ins. Co., 221 Conn. 185 (1992).
   3. The Act continues the requirement that the request for lower uninsured motorist limits be in writing.
   4. The request is ineffective unless any named insured has signed an "informed consent form" containing:
      1. an explanation of UM coverage which has been approved by the Insurance Commissioner.
      2. the uninsured motorist coverage options available.
      3. the premium costs for each option.
      4. a heading in 12-point type which states as follows:

      "When you sign this form you are choosing a reduced premium, but you are also choosing not to purchase certain valuable coverage which protects you and your family. If you are uncertain about how this decision will affect you, you should get advice from your insurance agent or another qualified advisor."

   5. The amendment authorizing a reduction of coverage by a writing signed by any named insured is not a clarification of the prior legislation and does not apply retroactively. Colonial Penn Insurance Co. v. Bryant, 45 Conn. App. 558 (1997); Aff=d. in part, 245 Conn. 710 (1998); General Accident Insurance Co. v. Powers, Bolles, Houlihan & Hartline, Inc., 50 Conn. App. 701 (1998), Aff=d., 251 Conn. 56 (1999).

6. **Coverage for Punitive or Statutory Damages**
   1. A claimant may not recover common law punitive damages, that is, attorneys fees and non-taxable costs, from an insurer under the uninsured motorist provisions of the policy, Bodnar v. USAA, 222 Conn. 480 (1992).
   2. Statutory double or treble damages set forth in C.G.S. '14-295 are not recoverable under an uninsured motorist endorsement. Caulfield v. Amica Mutual Ins. Co., 31 Conn. App. 781 (1993).

7. **Coverage for Accidents Caused by Force and Run Vehicles**
   1. Initially, UM coverage extended only to accidents involving physical contact between the insured or with a vehicle occupied by the insured. Rosnick v. Aetna Casualty and Surety Co., 172 Conn. 416 (1977). This requirement prohibited an uninsured motorist claim that did not involve physical contact, that is, a force and run claim.
   2. Physical contact has now been held to be inconsistent with the statutorily mandated uninsured motorist coverage. Streitweiser v. Middlesex Mutual Assurance Co., 219 Conn. 371 (1991).
   3. A claimant making a force and run uninsured motorist claim is not required to present independent corroborative evidence of the facts of the occurrence. Keystone Ins. Co. v. Raffle, 225 Conn. 223 (1993).
   4. In a case where the plaintiff pedestrian was struck by a vehicle whose driver stopped after the accident, but left the scene after the pedestrian affirmatively dismissed the driver, the court held that the plaintiff was not entitled to maintain an uninsured motorist claim under policy language permitted a claim for an accident involving a "hit and run vehicle whose operator or owner cannot be identified." Sylvestre v. United Service Auto Association, 42 Conn. App. 219 (1996).

8. **Limits of Coverage**
   1. The statute previously required an insurer to provide an insured with uninsured motorist coverage with limits equal to, but not exceeding, the bodily injury coverage limit, unless all named insureds request, in writing, a lesser amount.
   2. Limits of coverage after Public Act 93-197
      1. The Act requires insurers to offer uninsured motorist limits in an amount that is twice the limits of the insured's bodily injury coverage.
      2. UM coverage must still be at least equal to the policy's bodily injury coverage unless the named insured requests, in writing, a lesser amount.
   3. Pleading issues of policy limitation
      An insurer must raise issues of policy limitation by special defense, even when they are undisputed. Bennett v. Automobile Insurance Co. of Hartford, 230 Conn. 795 (1994).

## 2. MULTIPLE COVERAGES

1. **Stacking in General**
   1. A claimant may be covered under more than one uninsured motorist provision. It is well settled that an insured may stack or pyramid uninsured motorist coverages to obtain more complete indemnification for their injuries, Allstate Ins. Co. v. Ferrante, 201 Conn. 478 (1986), and subject to certain limitations to determine the availability of underinsured motorist benefits. Covenant Ins. Co. v. Coon, 220 Conn. 30 (1991).
   2. Inter-policy stacking is the aggregation of uninsured motorist coverages of separate and distinct policies insuring separate motor vehicles. Cohn v. Aetna Ins. Co., 213 Conn. 525 (1990).
   3. Intra-policy stacking is the aggregation of uninsured/underinsured motorist coverages of multiple vehicles insured under one policy where each vehicle is separately described and separate premiums are charged. Cohn, supra.
   4. Stacking derives from a presumption that when the insured purchases multiple coverages they intend to purchase additional protection. Cohn, supra.
   5. The reasonable expectations doctrine applies only in the context of personal auto policies. Chmielewski v. Aetna Casualty and Surety Co., 218 Conn. 646 (1991).

2. **Inter-policy Stacking and Underinsured Motorist Cases**
   1. In determining whether a motor vehicle is underinsured, the aggregate of the liability limits of all the tortfeasor's policies must be compared to the underinsured motorist coverage limit of each policy against which claim is being made. Covenant Ins. Co. v. Coon, 220 Conn. 30 (1991).
   2. If the total of the liability limit is less than the underinsured motorist limit of each individual policy, the individual UM policies may then be stacked. Covenant Ins. Co. v. Coon, supra.

3. **Limitations on Stacking**
   1. **Policy Language**
      The various policy provisions that have attempted to limit an insured's ability to stack under multiple policies or the same policy have been held to be invalid since such provisions are not authorized by statute or regulation.
      1. Other insurance clausesCSafeco Insurance Co. v. Vetre, 174 Conn. 329 (1978); Pecker v. Aetna Casualty and Surety Co., 171 Conn. 443 (1976).
      2. Limitation clausesCNationwide Ins. Co. v. Gode, 187 Conn. 386 (1982).
   2. **Single Premiums**
      Insurers are now charging a single premium for UM coverage for multiple vehicles insured under one policy, rather than charging a separate premium for each vehicle. This has been held to be effective in prohibiting intra-policy stacking when the single premium is actuarially appropriate and the policy language expressly prohibits stacking. Kent v. Middlesex Mutual Assurance Co., 226 Conn. 427 (1993).

4. **Fleet Stacking**
   1. The concept of stacking as an objectively reasonable expectation of the parties does not extend to "fleet insurance contracts." Chmielewski v. Aetna Casualty and Surety Co., 218 Conn. 646 (1991).
   2. Fleet insurance contracts are defined as a "fleet" or "garage" policy, or any insurance policy covering a number of vehicles owned by a business, a governmental entity, or an institution. Chmielewski, supra.

5. **Stacking After Public Act 93-297**
   1. The Public Act legislatively overturns case law and eliminates both intra-policy and inter-policy stacking.
   2. The occupant of a non-owned vehicle is entitled to pyramid coverages. When the claimant is occupying a non-owned vehicle such claimant is entitled to coverage under multiple policies, as long as the policy limit of each policy under which the claimant is making a claim exceeds the liability limit of the tortfeasor=s liability policy. If an insured is covered under multiple policies, the act limits the insured to recovering up to the highest uninsured motorist limit of any policy under which the insured is covered and then mandates the order of contribution among the multiple insurers up to the highest uninsured motorist limit of any one policy.

6. **Multiple CoveragesCWho Pays?**
   1. One of the most significant and difficult issues involved in a multiple policy UM case is the order of payment among the various insurers.
   2. Insurers have attempted to resolve the issue by including "other insurance" clauses in their policies. See P. Morello "The Problem of Multiple Uninsured Motorist Coverage: Who Pays?" 62 Conn. B. J. 358 (1998).
   3. While "other insurance" clauses cannot be used to prohibit an insured from stacking, they are valid to determine the order of payment among multiple uninsured motorist insurers. Aetna Casualty and Surety Co. v. CNA Ins. Co.,

4. Determining the proper order of priority among multiple insurers is difficult because the "other insurance" clauses used by the various carriers often are not uniform, and because no automatic rules apply.

5. Determining who pays requires a case-by-case examination of the factual issues, the occupancy by the claimant, and the ownerships of the vehicles involved. A comparison between the other insurance clauses must be made and if they can be reconciled they should be given effect.

6. Priorities of coverage after Public Act 93-297 - The Act to some degree mandates the order of payment among multiple UM insurers.

7. Recovery for an insured covered under multiple policies is limited by the Act up to the highest uninsured motorist limit of any policy under which the insured is covered. The Act then mandates the order of contribution among the multiple insurers up to the highest UM limit of any one policy. It provides the following rules:

   1. The claimant is an occupant of an owned vehicle, the UM coverage applicable to that owned vehicle is the sole UM coverage available;

   2. The claimant is an occupant of a non-owned vehicle

      1. The UM coverage of the occupied vehicle is primary;

      2. Any UM coverage for which the claimant is a named insured is secondary;

      3. Any other policies under which the claimant is an insured, for example, as a resident relative, are excess;

      4. In the event there are multiple excess policies the amount paid by the excess insurers is pro-rated.

3. **REDUCTIONS OF COVERAGE**
   1. **In General**
      1. An insurer may reduce its liability only as permitted by Regs. Conn. State Agency Sec. 38a-334-6(d). Lowrey v. Valley Forge Ins. Co., 224 Conn. 152 (1992).

      2. The policy must contain language incorporating the reductions permitted by the regulation. If the policy fails to take advantage of the reductions, the insurer should be barred from reducing its coverage. Chmielewski v. Aetna Casualty and Surety Co., 218 Conn. 646 (1991).

   2. **Reduction for Damages Paid by or on Behalf of Any Person Responsible for the Injury - Regs. Conn. State Agency Sec. 38a-334-6(d)(1)**
      1. Policy language allowing the insurer to reduce its coverage by "all sums paid because of the bodily injury by or on behalf of persons or organizations who may be legally responsible" restricts the insurer to deducting payments only to the claimant, not payments made to other persons. Buell v. American Universal Ins. Co., 224 Conn. 766 (1993).

      2. The question of whether the statute or regulation would permit an insurer to take credit for payments made to other claimants has now been resolved in Allstate Ins. Co. v. Lenda, 34 Conn. App. 444 (1994).

         1. The policy at issue in Lenda provided as follows: The limits of this coverage will be reduced by: (1) All amounts paid by the owner or operator of the uninsured auto or anyone else responsible..." The court found that under the terms of this policy, Allstate was entitled to reduce the amount of UM benefits payable to the claimant by all amounts paid by the tortfeasor to all injured parties, including amounts paid for personal injury and property damage. The court further found that the regulation authorized this type of policy provision.

      3. The underinsured motorist carrier may also reduce its liability by taking credit for a tortfeasor's personal payment to the insured. Lumbermen's Mutual Casualty Co. v. Huntley, 223 Conn. 22 (1992).

      4. The regulation allows an insurer to deduct a settlement payment from a party who may not be construed as a tortfeasor from the damages owed to its insured. Buell v. American Universal Ins. Co., supra.

      5. Payments made under a dram shop policy may not be deducted. American Universal Ins. Co. v. DelGreco, 205 Conn. 178 (1987).

      6. Reduction not applicable to underinsured motorist conversation coverage.

         1. Underinsured motorist conversation coverage is not subject to a reduction for amounts paid by or on behalf of the tortfeasor. Public Act 93-297 Sec. 2(c).

            1. The total amount of recovery by the claimant may exceed the underinsured motorist conversion coverage limit.

   3. **Reduction for Workers' Compensation -** The policy may provide for the reduction of limits to the extent that damages have been paid or are payable under workmen's compensation or disability benefits law. See Rydingsword v. Liberty Mutual Ins. Co., 224 Conn. 8 (1992); Wilson v. Security Ins. Co. 213 Conn. 532 (1990).

1. The deduction includes workers' compensation benefits already paid, as well as those payable to the claimant. Rydingsword v. Liberty Mutual Ins. Co., supra.

2. C.G.S. Sec. 31-293a which allows employers who have made Workers= Compensation payments to employees injured by a third party to bring suit to recover those payments from the third party or to intervene in the employee=s action against such third party, does not allow an employer to make such a claim against any recovery that the employee may be entitled to under the employee=s own uninsured motorist provisions of his or her automobile insurance policy. Dodd v. Middlesex Mutual Assurance Co., 242 Conn. 375 (1997).

4. **Reduction for Damages Paid or Payable Under Disability Benefit Law-** The policy may provide for the reduction of limits by an amount equal to the sum of Social Security Disability benefits paid or payable to the insured. Vitti v. Allstate Insurance Co., 245 Conn. 169 (1998).

5. **Reduction for Damages Paid Under the Policy in Settlement of a Liability Claim-** The policy may provide for the reduction of limits to the extent that damages have been paid under the policy in settlement of a liability claim. Regs. Conn. State Agency Sec. 38a-334-6(d).

   1. The Regulation does not address whether the reduction extends to the total amounts paid to all claimants or only the amount paid to each individual claimant. American Motorist Ins. Co. v. Gould, 213 Conn. 625 (1990).

   2. Policy language that reduces UM limits by payments made on behalf of the tortfeasor, including "all sums" paid under the liability portion of the policy refers to payments made to all liability claimants. American Motorist Ins. Co. v. Gould, supra.

6. **Reduction for Direct Indemnity for Medical Expense and for Basic Reparations Benefits**

   1. The Regulation does not allow the claimant to deduct attorneys fees from the reimbursement for reparations benefits. Dugas v. Lumbermens Mutual Casualty Co., 217 Conn. 631 (1991).

   2. An insurer that pays its insured no-fault benefits is entitled to reduce the damages that the insured receives under the uninsured motorist coverage by the full amount of basic reparations benefits paid to the insured. Dugas, supra.

   3. Basic reparations benefits includes both basic and added reparations benefits. Shelby Mutual Ins. Co. v. Della Ghelfa, 200 Conn. 630 (1986).

   4. The statutory provision relating to the State=s no-fault motor vehicle insurance scheme were repealed by Public Act 93-297 effective Janury 1, 1994.

7. **Collateral Source Reduction**

   1. The uninsured motorist statute and regulations do not expressly provide for collateral sources to be deducted from uninsured motorist coverage. Smith v. Safeco Ins. Co. of America, 225 Conn. 566 (1993).

   2. The statutory language of C.G.S. '52-225a does not extend to reduce uninsured motorist coverage.

   3. Although the collateral source statute is not an authorized reduction of uninsured motorist coverage, it applies to reduce the amount of the claimant's recoverable damages. Smith, supra.

   4. "A claimant is entitled to the full amount of underinsured motorist coverage if, after the claimant's recovery from the tortfeasor has been reduced by collateral source payments, the claimant's uncompensated damages exceed the amount of the insurance coverage." Smith, supra.

   5. "A claimant's recourse to underinsured motorist coverage is limited in amount to less than his or her full coverage if the amount of the award against the tortfeasor for personal and economic damages, reduced in accordance with '52-225a, results in damages that are less than the full amount of underinsured motorist coverage." Smith, supra.

4. **SELECTED ISSUES**

   1. **Workers' Compensation as a Bar**

      1. Prior to the enactment of Public Act 93-297, an employee who had received or was eligible to receive Workers' Compensation benefits for injuries arising from an automobile accident while operating his or her employer's motor vehicle during the course of employment was barred by the exclusivity provisions of C.G.S. '31-284(a) from recovering uninsured motorist benefits from a self-insured employer, CNA Insurance Co. v. Colman, 222 Conn. 769 (1992) or from the employer's insurer. Bouley v. Norwich, 222 Conn. 744 (1992).

      2. Public Act 93-297 amended C.G.S. '31-284(a) to legislatively overrule Bouley and Colman by removing an uninsured motorist claim from the operation of the Workers' Compensation statute's exclusive remedy provisions.

3. Public Act 93-297 was intended to be clarified in legislation and, therefore, an employee was not barred from recovering uninsured motorist benefits from his or her employer=s insurer for a motor vehicle accident that occurred prior to the effective date of the public act. Reliance v. American Casualty Co. of Redding, PA, 238 Conn. 285 (1996).

4. In Reliance Insurance Co. v. American Casualty Insurance Co., 238 Conn. 285 (1996), the personal UIM carrier of an injured employee commenced an action for reimbursement of sums that it had paid for UM benefits against the automobile liability carrier of the employer. The supreme court held that Public Act 93-297, which amended C.G.S. '31-284(a) was retroactive.

Note: It is hard to imagine how the court came to this conclusion due to the fact that Section 29 of Public Act 93-297 expressly states that the provisions of this section have only prospective effect.

2. **Trial De Novo**

1. A provision in an insurance contract that allows a party to demand a trial de novo when an arbitration award exceeds the state statutory minimum coverage for bodily injury coverage but makes binding any award less than that amount unfairly favors the insurer and is unenforceable. Mendes v. Automobile Insurance Co. of Hartford, 212 Conn. 652 (1989).

3. **General Rules for Application of Statutes of Limitations**

1. Claims arising prior to May 20, 1993.

1. If the policy is subject to a two-year contractual time limitation set forth in the policy of insurance and does not fall within the savings clause of Public Act 93-77, Sec. 3, then the two-year contractual time limitation clause is valid and suit must be filed or arbitration demanded within the two-year contractual time limitation. or arbitration demanded within the two-year contractual time limitation. Wynn v. Metropolitan Property & Casualty Ins. Co., 30 Conn. App. 803 (1993); Aff=d. 228 Conn. 436

(1994); Prudential Property & Casualty Ins. Co. v. Perez-Henderson, 49 Conn. App. 653 (1998); Coelho v. ITT Hartford, 251 Conn. 106 (1999).

2. If the claim is subject to a two-year contractual limitation clause set forth in the policy, but falls within the savings clause of Public Act 93-77 Sec. 3, then a six-year statute of limitations applicable to contract actions generally, i.e., C.G.S. Sec. 52-576, would apply. Bayusik v. Nationwide Mutual Ins. Co., 233 Conn. 474 (1995).

3. If the claim is not subject to any contractual time limitations clause, then the six-year contract statute of limitations would apply. Wynn v. Metropolitan Property & Casualty Ins. Co., 30 Conn. App. 803 (1993), Aff=d. 228 Conn. 436 (1994).

2. Claims arising post May 20, 1993 (Copy)

4. **Disclaimer of Coverage by Tortfeasor's Liability Carrier**

1. Neither the statutes nor the regulations enacted thereunder provide for the maintenance of an uninsured motorist claim where the tortfeasor's insurer disclaims coverage to its insured.

2. Many policies extend such coverage to situations in which a bodily injury liability bond or insurance policy applies at the time of the accident, but the company writing that bond or policy denies coverage thereunder.

3. In AIU Insurance Co. v. Brown, 42 Conn. App. 363 (1996), the liability carrier had commenced a declaratory judgment action against its insured claiming that it had no obligation to defend or indemnify the insured in a third party claim. The uninsured motorist insurer attempted to intervene so as to forestall a possible UM claim against it. The trial court denied intervention. The appellate court reversed and held that a potential uninsured motorist insurer has a right to intervene in a declaratory judgment action commenced by the liability carrier which is attempting to disclaim coverage as to the tortfeasor. In view of the fact that the right to uninsured motorist coverage might be implicated, the uninsured motorist carrier had a meritorious right to intervene.

4. In Westchester Fire Insurance Co. v. Allstate Insurance Co., 236 Conn. 362 (1996), an uninsured motorist insurer that had paid UM benefits to its insured commenced an action against the tortfeasor's liability insurer which had denied coverage on the tortfeasor's vehicle on the basis that the vehicle was not listed as a covered vehicle. The UM carrier instituted a subrogation action against the liability insurer on the basis that the liability carrier had improperly denied liability benefits. In permitting a subrogation action in this context, the supreme court overruled the cases of Berlinski v. Ovellette, 164 Conn. 482; and Ciulewicz v. Doyle, 172 Conn. 177 (1976) which had previously prohibited prejudgment assignment of personal injury claims.

5. **Legally Entitled to Recover**

1. The contractual phrase Alegally entitled to recover@ requires more than simply proving that the uninsured motorist was at fault and that the claimant

has sustained damages. To recover UM benefits, a claimant must prove that under the insurance contract, as well as under the applicable statutes and regulations, he or she is legally entitled to recover damages from the uninsured motorist, that is, that the other motorist was uninsured or underinsured; that the other motorist was legally liable under applicable law; and the amount of damages sustained. The second element involves a consideration of the substantive defenses available to the uninsured motorist. Williams v. State Farm Mutual Ins. Co., 229 Conn. 359 (1994).

### 6. Stays of Arbitration

1. An insured can proceed to arbitration under the uninsured motorist provisions of the insured's policy when one of the two alleged joint tortfeasors is insured and the other is uninsured, even though the claimant's suit against the insured tortfeasor is still pending. Buell v. American Universal Insurance Co., supra; General Accident Insurance Co. v. Wheeler, 221 Conn. 206 (1992).

### 7. Interest

1. C.G.S. '37-3a allows a trial court to impose prejudgment interest from the date of the award. Middlesex Mutual Assurance Co. v. Walsh, supra.

### 8. Choice of Law

1. In Williams v. State Farm Mutual Automobile Ins. Co., 229 Conn. 359 (1994), the supreme court applied New York substantive law in an underinsured motorist claim involving an accident that took place in New York, a plaintiff who was a Connecticut resident, and a tortfeasor who held a California license and drove a motor vehicle registered in New York.

2. In Reichold Chemicals Inc. v. Hartford Accident & Indemnity Co., 243 Conn. 401 (1997), the supreme court abandoned the traditional rule of Lex Loci Contractis in favor of the restate in second of conflict of law=s approach to resolving choice of law questions and contract cases.

### 9. Claim or Issue Preclusion

1. The underinsured motorist insurer and the tortfeasor do not share the same legal right and, therefore, they are not in privity such as to invoke the doctrine of collateral estoppel. Mazziotti v.Allstate Ins. Co., 240 Conn. 799 (1997).

### 10. Subrogation Actions

1. UIM Insurer v. Liability Insurer: In Westchester Fire Insurance Co. v. Allstate Insurance Co., an uninsured motorist insurer who had paid benefits to its insured commenced an action against the tortfeasor's liability insurer. The liability insurer denied coverage on the tortfeasor's vehicle on the basis that this vehicle was not listed as a covered vehicle. The UM carrier instituted a subrogation action on the basis that the liability carrier had improperly denied liability benefits. The trial court struck the action noting that Connecticut did not permit subrogation of UM claims. The supreme court held that once UM benefits had been paid, the UM carrier may step into the shoes of the party it paid, i.e., the insured, and commence a subrogation action in order to recover payments that it made in order to prevent unjust enrichment of the party whose debt it paid. In permitting a subrogation action in this context, the supreme court overruled the cases of Berlinski v. Ovellette, 164 Conn. 482 (1973) and Ciulewicz v. Doyle, 172 Conn. 177 (1976).

2. UIM Insurer v. Tortfeasor: Although this case was decided in the context of the ability of a UM carrier to institute a subrogation action against a disclaiming liability carrier, it would appear that this principle would also allow a UM carrier, after it has paid UM benefits, to commence a subrogation action against the liable tortfeasor.

3. Legislatively overruled in UIM context by Public Act 97-58 '4.

## 5. SPECIAL CONSIDERATIONS IN UNDERINSURED MOTORIST CASES

### 1. Exhaustion

1. An insurer is obligated to pay its underinsured motorist coverage only after full exhaustion of the tortfeasor's liability insurance policies. C.G.S. '38a-336(b).

2. A settlement for less than the full amount of the tortfeasor's liability policy limit does not constitute the exhaustion required by the statute even if the uninsured motorist insurer is allowed a credit against its coverage for the full policy limit of the tortfeasor's coverage. Continental Insurance Co. v. Cebe-Habersky, 214 Conn. 209 (1990).

3. A claimant need only exhaust the per-person limit of a split limit policy before proceeding to make an underinsured motorist claim. Covenant Insurance Co. v. Coon, supra.

4. Since a dram shop policy is not an automobile liability policy, the claimant need not exhaust dram coverage before proceeding to make an underinsured motorist claim. American Universal Insurance Co. v. DelGreco, 205 Conn. 178 (1987).

5. An insured need only exhaust the liability bond or insurance policies of one tortfeasor to be eligible to pursue underinsured motorist benefits. General Accident Ins. Co. v. Wheeler, 221 Conn. 206 (192).

However, when a claimant is injured in an accident involving a vehicle operated by one party and owned by another in which the operator and owner are covered under separate insurance policies, the claimant must exhaust the liability coverages available under both the operator's and the owner's policies before making an uninsured/underinsured motorist claim. Ciarelli v. Commercial Union Ins. Co., 234 Conn. 807 (1995).

## 2. Definition of Underinsured Motor Vehicle

1. For an insured to make an underinsured motorist claim, the tortfeasor's motor vehicle must be underinsured as defined in the statute. Travelers Ins. Co. v. Kulla, 216 Conn. 390 (1990).

2. To determine whether a motor vehicle is "underinsured," the total amount of all automobile liability insurance policies on the tortfeasor's motor vehicle must be compared to the amount of underinsured motorist coverage provided by each policy against which the insured is making an underinsured motorist claim. Covenant Insurance Co. v. Coon, supra.

3. If the total amount of all automobile liability insurance policies on the tortfeasor's vehicle is less than the amount of underinsured motorist coverage provided by each individual underinsured motorist policy, then the underinsured motorist coverage is triggered.

4. If such amount is greater than the underinsured motorist coverage provided by each individual underinsured motorist policy, the underinsured motorist coverage is not accessed. Covenant Insurance Co. v. Coon, supra.

5. This analysis limits "inter-policy stacking" in underinsured motorist cases. Because the statute references the tortfeasor's liability limits in the plural, but the underinsured motorist provisions in the singular. Covenant Insurance Co. v. Coon, supra.

6. The determination of whether a motor vehicle is underinsured requires a comparison of the aggregate of liability limits and the underinsured motorist limit of each individual policy against which the insured has a claim. Covenant Insurance Co. v. Coon, supra.

7. Definition of underinsured motor vehicle in underinsured motorist conversion coverage.
   1. In underinsured motorist conversion coverage, an underinsured motor vehicle is defined as "a motor vehicle with respect to which the sum of the limits of liability under all bodily injury liability bonds and insurance policies applicable at the time of the accident is less than the fair, just and reasonable damages of the covered person."
   2. This definition makes a comparison of the liability limits of the tortfeasor's vehicle with the fair, just and reasonable damages of the covered person. If such damages are greater than the tortfeasor's liability coverage, the tortfeasor's vehicle is underinsured.
   3. This definition is a factual question.

8. An all terrain vehicle is not a Amotor vehicle@ as defined by C.G.S. Sec. 14-1(47) since it is not suitable for operation on a highway, but it is a motor vehicle as defined under certain policies of insurance and may constitute an uninsured motor vehicle for such purposes. Norfolk & Dedham Fire Ins. Co. v. Wysocki, 45 Conn. Supp. 144 (1997); Aff=d. 243 Conn. 239 (1997).

## 3. Credit Against Underinsured Motorist Limits

1. Is each underinsured motorist insurer entitled to take a separate credit for the tortfeasor's liability coverage?

2. When the claimant has an underinsured motorist claim under more than one underinsured motorist policy, the underinsured motorist limits under the policies are stacked, and the amount of damages paid by the tortfeasor are subtracted from the total stacked underinsured motorist coverage, not from each individual underinsured motorist policy. Allstate Ins. Co. v. Link, 35 Conn. App. 338 (1994).

## 4. Upper Limit of Underinsured Motorist Recovery

1. Depending upon the policy language, the total amount of damages received by the claimant may exceed the underinsured motorist limits of the underinsured motorist policy.
   1. In USF&G v. Pitruzzello, 35 Conn. App. 638 (1994), the court held that the insurer was not entitled to credits for payments made to other claimants by or on behalf of the tortfeasor and calculating the offset against damages owed to each of the claimants in that case. The underinsured motorist provision of the USF&G policy provided "any amounts otherwise payable as damages under this coverage shall be reduced by all sums paid because of the bodily injury by or on behalf of persons or organizations who may be legally responsible."
   2. USF&G v. Pitruzzello held that the specific terms of the underinsured motorist policy at issue did not entitle the insurer to take a credit for payments made to other claimants in calculating the offset of damages owed to each of the claimants and collectively, therefore, the claimants

could recover an amount in excess of the underinsured motorist coverage.

   2. In Holmes v. Government Employees Ins. Co., 13 Conn. L.Rptr. No. 11, 348 (1995), the court held that the maximum benefit as limited by C.G.S. Section 38-336(b) is not reduced by payments received from the tortfeasor's liability policy for a party covered by but not claiming underinsured motorist benefits.

   3. Upper limit of recovery under underinsured motorist conversion coverage.
      1. The Act expressly excepts underinsured motorist conversion coverage from the operation of the above limitation on the claimant's recovery. Payments made by or on behalf of the tortfeasor do not reduce the limit of conversion coverage and, therefore, the total recovery by the claimant under such coverage can exceed the conversion coverage limit.

### 5. Underinsured Motorist Conversion Coverage

   1. This is a new category of underinsured motorist coverage. It requires insurers to offer uninsured motorist coverage in an amount up to twice the limits of the insured's liability coverage.

   2. This coverage is in lieu of the statutory uninsured motorist coverage provided by C.G.S. '38a-336.

   3. The limit of this coverage is not subject to a reduction for amounts paid by or on behalf of the tortfeasor.
      1. As a result, the total amount of recovery by the claimant may exceed the underinsured motorist conversion coverage limit.

   4. Since conversion coverage is in lieu of the statutory underinsured motorist coverage, and the regulations apply only to statutory underinsured motorist coverage, whether any of the other reductions or exclusions would apply to this coverage is a question.

   5. The Act also changed the definition of what constitutes an "underinsured motor vehicle." The Act defines an underinsured motor vehicle as a "motor vehicle with respect to which the sum of the limits of liability under all bodily injury liability bonds and insurance policies applicable at the time of the accident is less than the fair, just and reasonable damages of the covered person."
      1. This definition compares liability limits on the tortfeasor's vehicle with the fair, just and reasonable damages of the covered person. If such damages are greater than the liability coverage, the tortfeasor's vehicle is underinsured.

   6. An insurer providing conversion coverage may exclude from such coverage Aa vehicle owned by the insured or available for the regular use of any family member of the insured.@ Fleet National Bank v. Aetna Ins. Co., 45 Conn. Supp. (1998). Aff=d. 245 Conn. 546 (1998).

## 6. EXCLUSIONS
### 1. Consent to Settle
   1. Common Law Subrogation. In Berlinski v. Ovellette, 164 Conn. 482 (1973) the court held that at common law and in the absence of a statutory provision to the contrary, a cause of action for personal injuries resulting from negligence could not be assigned before judgment.

   2. This result was changed by the court=s decision in Westchester Fire Ins. Co. vs. Allstate Ins. Co., 236 Conn. 362 (1996) which overruled Berlinski and held that an uninsured motorist insurer that had paid uninsured motorist benefits to its insured is subrogated, to the extent of its payments, to the insured=s personal injury cause of action against the tortfeasor.

   3. Public Act 97-58 Sec. 4 legislatively overruled Westchester in part. The Act provides as follows: ANo insurer providing underinsured motorist coverage as required under Title 38a of the General Statutes shall have any right of subrogation against the owner or operator of the underinsured motor vehicle for underinsured motorist benefits paid or payable by the insurer.
      1. This Act prohibits subrogation in the underinsured motorist context only. It continues to allow subrogation against uninsured motorists.

      2. One purpose of a consent to settle requirement is to protect the subrogation rights of the uninsured motorist insurer against the tortfeasor. Berts v. Horace Mann Ins. Co., 14 Conn. Law Rptr. No. 17, 523 (1995).

      3. Since Westchester has been legislatively overruled in part by Public Act 97-58 Section 4 which prohibits subrogation rights in the underinsured motorist context, the purpose of a consent to settle clause in underinsured motorist cases would seem to be vitiated.

### 2. Vehicles Owned by or Available for the Regular Use of the Named Insured or Resident Relatives
   1. The purpose of the clause is to cover the insured's infrequent or casual use of vehicles not described in the policy, but to exclude coverage for vehicles the insured regularly uses. Lumbermens Mutual Casualty Co. v. Charland, 6 C.L.T. No. 17 (1980).

Regulation makes no distinction between the liability coverage and uninsured motorist coverage. Lowrey v. Valley Forge Ins. Co., 224 Conn. 152 (1992).

3. The regulation applies generally to one-car accidents in which passengers seek to recover from an insurer under both the liability and underinsured motorist coverage for the vehicle involved in the accident. See Lowrey v. Valley Forge Ins. Co., supra.

4. Insureds who seek greater protection from their own negligence for their passengers have the option of purchasing greater liability limits, or an umbrella policy. Lowrey v. Valley Forge Ins. Co., supra.

5. Allowing passengers in an insured vehicle to collect under the liability portion of the policy as well as the underinsured portion would be to convert the underinsured motorist coverage into liability coverage. Lowrey v. Valley Forge Ins. Co.

6. In the case of a two-car accident, the exclusion has been found to be inapplicable and a passenger has been allowed to assert a claim under both the liability portion of the policy and the underinsured portion of the same policy. Cataline v. General Accident Ins., 11 Conn. L.Rptr. No. 16, 502 (1994).

3. **Self-Insurers**

1. This exclusion prohibits an uninsured motorist claim if the tortfeasing vehicle is owned by a self-insurer. Orkney v. Hanover Ins. Co., 248 Conn. 195 (1999).

4. **Government-Owned Vehicles**

1. This exclusion prohibits an uninsured motorist claim if the tortfeasing vehicle is owned by a government or agency thereof.

5. **Reimbursement for Workers' Compensation Benefits**

1. Uninsured motorist limits may be reduced by workers' compensation benefits received by a claimant thereby reducing the claimant's damages.

2. Although a workers' compensation insurer is entitled to a lien on the claimant's recovery arising out of a third party claim, a workers' comp insurer does not have a lien on or a right of reimbursement from the claimant's recovery of uninsured motorist benefits. Dodd v. Middlesex Mutual Assurance Co., 242 Conn. 375 (1997).

6. **Causal Connection of Uninsured Motor Vehicle with Accident**

1. The regulation requires that the uninsured motor vehicle be causally connected to the loss for which the claimant seeks compensation. Travelers Ins. Co. v. Kula, 216 Conn. 390; Regs. Conn. State Agency, '38a-334-6(a).

7. **Person-Oriented Coverage**

1. Public Act 83-461 amended '38a-336 to provide that "no insurer shall be required to provide uninsured motorist coverage to (a) a named insured or relatives residing in his household when occupying, or struck as a pedestrian by, an uninsured or underinsured motor vehicle or motorcycle that is owned by the named insured, or (b) to any insured occupying an uninsured or underinsured motor vehicle owned by such insured."

2. This amendment changes the person-oriented nature of uninsured motorist coverage to some degree to a vehicle-oriented type of coverage.

3. The statutory term "underinsured motor vehicle" refers to a tortfeasing vehicle. Sentry Insurance Co. v. Schroeder, 9 Conn. L.Rptr., No. 12, 375 (1993). If the underinsured motor vehicle is not the tortfeasing motor vehicle, the exclusion does not apply. Aetna Casualty and Surety Co., et al v. Arduini, et al, 4 Conn. L.Rptr. No. 9, 288 (1991).

8. **Coverage for Resident Relatives Owning Their Own Vehicles**

1. An insurer may exclude from uninsured motorist coverage a resident relative of the named insured who owns his or her own car and who is injured by an uninsured motorist while occupying his or her own car. Middlesex Assurance Co. v. Quinn, 225 Conn. 257 (1993).

9. **Named Driver Exclusion**

1. C.G.S. Section 38a-335(d) and Regs. Conn. State Agency Sec. 38a-334-5(c)(a) allow an insurer to exclude by endorsement the named insured and residents residing in his or her household from coverage under the liability portion of the policy. The rationale behind such exclusion is to allow unlicensed persons who own a motor vehicle, such as the elderly or handicapped, to benefit by having other persons operate their vehicles. Colonial Penn Ins. Co. vs. Patriot General Ins. Co., 22 Conn. Law Rptr. No. 10, 355 (1998).

2. Therefore, an insured who executed a named driver exclusion endorsement which endorsement excludes her from liability coverage while operating the insured vehicle, and who was involved in a collision while operating the vehicle insured under the policy, is excluded from liability coverage under the policy insuring the vehicle and such exclusion renders said vehicle an uninsured motor vehicle. Colonial Penn Ins. Co. vs. Patriot General Ins. Co., 22 Conn. Law Rptr. No. 10, 355 (1998).

50          2759          0          0

**RESEARCH THE LAW**    Cases & Codes (http://caselaw.findlaw.com/) / Opinion Summaries (http://caselaw.findlaw.com/summary.html) / Sample Business
Contracts (http://corporate.findlaw.com/contracts.html) / Research An Attorney or Law Firm (http://lawyers.findlaw.com/)

**MANAGE YOUR PRACTICE**    Law Technology (http://technology.findlaw.com/) / Law Practice Management (http://practice.findlaw.com/) / Law Firm Marketing
Services (http://www.lawyermarketing.com/) / Corporate Counsel Center (http://corporate.findlaw.com/)

**MANAGE YOUR CAREER**    Legal Career Job Search (http://careers.findlaw.com/) / Online CLE (http://westlegaledcenter.com/home/homepage.jsf?
sc_cid=Findlawclecprtab) / Law Student Resources (http://lawstudents.findlaw.com/)

**NEWS AND COMMENTARY**    Law Commentary (http://supreme.findlaw.com/legal-commentary.html) / Featured Documents (http://blogs.findlaw.com/courtside/) /
Newsletters (http://newsletters.findlaw.com/) / Blogs (http://legalblogs.findlaw.com/) / RSS Feeds (http://www.findlaw.com/rss-index.html)

**GET LEGAL FORMS**    Legal Forms for Your Practice (http://www.uslegalforms.com/a/findlaw)

**ABOUT US**    Company History (http://company.findlaw.com/company_info.html) / Media Relations
(http://company.findlaw.com/media_relations.html) / Contact Us (http://company.findlaw.com/contacts.html) / Privacy (http://company.findlaw.com/privacy.html) /
Advertising (http://company.findlaw.com/adkit/index.html) / Jobs (http://company.findlaw.com/employment/employment.html)

**FIND US ON**

Copyright © Fri Apr 07 13:34:31 PDT 2017, Thomson Reuters. All rights reserved.

MIDDLESEX VICINAGE CIVIL DIVISION
P O BOX 2633
56 PATERSON STREET
NEW BRUNSWICK     NJ 08903-2633

                                TRACK ASSIGNMENT NOTICE

COURT TELEPHONE NO. (732) 519-3728
COURT HOURS  8:30 AM - 4:30 PM

                    DATE:   MARCH 28, 2017
                    RE:     FULLER DEBORAH VS MATALON VIVIENNE
                    DOCKET: MID L -001859 17

      THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 3.

      DISCOVERY IS   450 DAYS AND RUNS FROM THE FIRST ANSWER OR 90 DAYS
FROM SERVICE ON THE FIRST DEFENDANT, WHICHEVER COMES FIRST.

      THE PRETRIAL JUDGE ASSIGNED IS:  HON ARNOLD L. NATALI

      IF YOU HAVE ANY QUESTIONS, CONTACT TEAM     002
AT:  (732) 519-3737 EXT 3737.

      IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
 CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
      PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH  R.4:5A-2.
                    ATTENTION:

                         ATT: RICHARD J. HOLLAWELL
                         CONSOLE & HOLLAWELL PC
                         5 GREENTREE CENTER STE 117
                         525 RTE 73 NORTH
                         MARLTON          NJ 08053
JUMGAR2

# EXHIBIT B

 **CT Corporation**

**Service of Process Transmittal**
04/14/2017
CT Log Number 531057684

**TO:**   Franc Del Fosse
Insys Therapeutics, Inc.
1333 S Spectrum Blvd, Suite 100
Chandler, AZ 85286

**RE:**   **Process Served in Arizona**

**FOR:**   INSYS THERAPEUTICS, INC.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | DEBORAH FULLER & DAVID FULLER, as Administrators Ad Prosequendum for the Estate of SARAH A. FULLER, deceased, et al., PLtfs. vs. VIVIENNE MATALON, M.D., et al., Dfts. // To: INSYS THERAPEUTICS, INC. |
| **DOCUMENT(S) SERVED:** | Letter(s), Summons, Attachment(s), Statement(s), Complaint, Exhibit(s) |
| **COURT/AGENCY:** | MIDDLESEX COUNTY - SUPERIOR COURT OF NEW JERSEY - LAW DIVISION, NJ Case # MIDL185917 |
| **NATURE OF ACTION:** | Medical Injury - Improper Care and Treatment |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Phoenix, AZ |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 04/14/2017 postmarked on 04/12/2017 |
| **JURISDICTION SERVED:** | Arizona |
| **APPEARANCE OR ANSWER DUE:** | Within 35 days from the date you received this summons, not counting the date you received it |
| **ATTORNEY(S) / SENDER(S):** | Richard J. Hollawell CONSOLE & HOLLAWELL, P.C. Five Greentree Centre 525 Route 73 North, Suite 117 Marlton, NJ 08053 856-778-550 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 04/15/2017, Expected Purge Date: 04/20/2017 |
| | Image SOP |
| | Email Notification,  Franc Del Fosse  fdelfosse@insysrx.com |
| | Email Notification,  Marie Aucoin  maucoin@insysrx.com |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 3800 N Central Avenue Suite 460 Phoenix, AZ 85012 |
| **TELEPHONE:** | 602-248-1145 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.



U.S. POSTAGE
PAID
MARLTON, NJ
08053
APR 12
AMOUNT
**$14.45**
R2303S103948-06


1006

CERTIFIED MAIL

7015 0640 0001 0718 3661

Insys Therapeutics, Inc.
c/o CT Corporation System
3800 N. Central Avenue, Suite 460
Phoenix, AZ 85012

205988
CONSOLE | HOLLAWELL
PERSONAL INJURY TRIAL ATTORNEYS

Five Greentree Centre
525 Route 73 North
Suite 117
Marlton, NJ 08053




*PRIORITY*
*MAIL*
UNITED STATES POSTAL SERVICE
...at usps.com

# CONSOLE | HOLLAWELL

PERSONAL INJURY TRIAL ATTORNEYS

** Richard P. Console, Jr.
** Richard J. Hollawell
* Michael E. Ellery
* † Mark C. Dewland
* Member of NJ and PA Bars
♦ Member of NY Bar
† Of Counsel

April 11, 2017

Via Certified Mail, R.R.R.
Insys Therapeutics, Inc.
c/o CT Corporation System
3800 N. Central Avenue, Suite 460
Phoenix, AZ 85012

Re:     Fuller v. Matalon, et al
        Docket No. MID-L-1859-17

Dear Sir/Madam:

Enclosed please find a Summons, Civil Case Information Statement (CIS), Complaint, and Track Assignment Notice which have been filed against you in the Superior Court of New Jersey, Middlesex County. You have thirty-five days within which to respond to this Complaint or a judgment may be entered against you.

Also enclosed is Plaintiffs' First Set of Request for Admissions.

Please be guided accordingly.

Very truly yours,

*Richard J. Hollawell*

Richard J. Hollawell
rhollawell@consoleandhollawell.com

RJH/ldm
Encl.

Please send all correspondence to Marlton, NJ Office

Main Office
MARLTON, NJ OFFICE
525 Route 73 North
Suite 117
Marlton, NJ 08053
(856)-778-5500

PHILADELPHIA, PA OFFICE
1650 Market Street
Suite 3600
Philadelphia, PA 19103
(215) 225-2040

**Console & Hollawell, P.C.**
Telephone: (856) 778-5500
Fax: (856) 778-1918
Toll Free: (866) 778-5500
Email: Info@consoleandhollawell.com
www.consoleandhollawell.com

NEWARK, NJ OFFICE
One Gateway Center
Suite 2600
Newark, NJ 07102
(973) 416-1146

ALLENTOWN, PA OFFICE
3477 Corporate Parkway
Suite 100
Center Valley, PA 18034
(610) 432-2112

CONSOLE & HOLLAWELL, P.C.
Richard J. Hollawell, Esquire
Attorney I.D. No.: 018122001
Five Greentree Centre
525 Route 73 North, Suite 117
Marlton, New Jersey 08053
(856) 778-5500
Attorneys for Plaintiffs

| | | |
|---|---|---|
| DEBORAH FULLER & DAVID FULLER, as Administrators Ad Prosequendum for the Estate of SARAH A. FULLER, deceased and, DEBORAH FULLER, & DAVID FULLER, Individually | : : : : : | SUPERIOR COURT OF NEW JERSEY LAW DIVISION <br><br> MIDDLESEX COUNTY |
| Plaintiffs | : : : | DOCKET NO.: MID-L-1859-17 <br><br> *Civil Action* |
| v. | : : | |
| VIVIENNE MATALON, M.D., TLC HEALTHCARE 2, LLC, INSYS THERAPEUTICS, INC.,  LINDEN CARE, LLC INC.,  JOHN DOE,  1-10 (fictitious), ABC CORPORATION 1-10(fictitious), Individually, Jointly, Severally and/or in the Alternative | : : : : : : : | SUMMONS |
| Defendants | : : | |

The State of New Jersey, To The Defendant Named Above:

        The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey.  The complaint attached to this summons states the basis for this lawsuit.  If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court of the county listed above within 35 days from the date you received this summons, not counting the date you received it.  (The address of each deputy clerk of the Superior Court is provided.)  If the complaint is one in foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971.  A filing fee payable to the Clerk of the Superior Court and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed.  You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above.  A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services Offices in the county where you live. A list of these offices is provided. If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A list of these numbers is also provided.

DATED: 4/11/2017                    By: *Michelle M. Smith*
                                         Michelle M. Smith, Clerk

Name of defendant to be served: Insys Therapeutics, Inc., c/o CT Corporation System
Address for Service: 3800 N. Central Avenue, Suite 460, Phoenix, AZ 85012

| | | | |
|---|---|---|---|
| **Atlantic County:** | | **Middlesex County:** | |
| Deputy Clerk of the Superior Court | LAWYER REFERRAL | Deputy Clerk of the Superior Court | LAWYER REFERRAL |
| Civil Division, Direct Filing | 609-345-3444 | Administration Building, 3rd Floor | 732-828-0053 |
| 1201 Bacharach Blvd., First Floor | LEGAL SERVICES | 1 Kennedy Square, P.O. Box 2633 | LEGAL SERVICES |
| Atlantic City, NJ  08401 | 609-348-4200 | New Brunswick, NJ  08903 | 732-249-7600 |
| | | | |
| **Bergen County:** | | **Monmouth County:** | |
| Deputy Clerk of the Superior Court | LAWYER REFERRAL | Deputy Clerk of the Superior Court | LAWYER REFERRAL |
| Case Processing Section, Room 119 | 201-488-0044 | Court House, 71 Monument Park | 732-431-5544 |
| Justice Center, 10 Main Street | LEGAL SERVICES | P.O. Box 1269 | LEGAL SERVICES |
| Hackensack, NJ  07601 | 201-487-2166 | Freehold, NJ  07728 | 732-866-0022 |
| | | | |
| **Burlington County:** | | **Morris County:** | |
| Deputy Clerk of the Superior Court | LAWYER REFERRAL | Deputy Clerk of the Superior Court | LAWYER REFERRAL |
| Central Processing Office | 609-261-4862 | Civil Division | 973-267-5882 |
| First Floor, Courts Facility | LEGAL SERVICES | 30 Schuyler Place | LEGAL SERVICES |
| 49 Rancocas Road | 609-261-1088 | P.O. Box 910 | 973-285-6911 |
| Mt. Holly, NJ  08060 | | Morristown, NJ  07960 | |
| | | | |
| **Camden County:** | | **Ocean County:** | |
| Deputy Clerk of the Superior Court | LAWYER REFERRAL | Deputy Clerk of the Superior Court | LAWYER REFERRAL |
| 1st Floor, Hall of Justice | 856-964-4520 | Courthouse, Room 119 | 732-240-3666 |
| 101 S. Fifth Street | LEGAL SERVICES | 119 Washington Street | LEGAL SERVICES |
| Camden, NJ  08103 | 856-964-2010 | Toms River, NJ  08754 | 732-341-2727 |
| | | | |
| **Cape May County:** | | **Passaic County:** | |
| Deputy Clerk of the Superior Court | LAWYER REFERRAL | Deputy Clerk of the Superior Court | LAWYER REFERRAL |
| 9 N. Main Street | 609-463-0313 | Civil Division, Courthouse | 973-278-9223 |
| Box DN-209 | LEGAL SERVICES | 77 Hamilton Street | LEGAL SERVICES |
| Cape May Courthouse, NJ  08210 | 609-465-3001 | Paterson, NJ  07505 | 973-345-7171 |
| | | | |
| **Cumberland County:** | | **Salem County:** | |
| Deputy Clerk of the Superior Court | LAWYER REFERRAL | Deputy Clerk of the Superior Court | LAWYER REFERRAL |
| Civil Case Management Office | 856-692-6207 | 92 Market Street | 856-935-5628 |
| Broad & Layette Streets, P.O. Box 615 | LEGAL SERVICES | P.O. Box 18 | LEGAL SERVICES |
| Bridgeton, NJ  08302 | 856-451-0003 | Salem, NJ  08079 | 856-451-0003 |
| | | | |
| **Essex County:** | | **Somerset County:** | |
| Deputy Clerk of the Superior Court | LAWYER REFERRAL | Deputy Clerk of the Superior Court | LAWYER REFERRAL |
| 50 West Market Street, | 973-622-6207 | New Court House, 3rd Floor | 908-685-2323 |
| Room 131 | LEGAL SERVICES | P.O. Box 3000 | LEGAL SERVICES |
| Newark, NJ  0710 | 973-624-4500 | Somerville, NJ  08876 | 908-231-0840 |
| | | | |
| **Gloucester County:** | | **Sussex County:** | |
| Deputy Clerk of the Superior Court | LAWYER REFERRAL | Deputy Clerk of the Superior Court | LAWYER REFERRAL |
| Civil Case Management Office | 856-848-4589 | Sussex County Judicial Center | 973-267-5882 |
| First Floor, Courthouse | LEGAL SERVICES | 43-47 High Street | LEGAL SERVICES |
| 1 N. Broad Street, P.O. Box 129 | 856-848-5360 | Newton, NJ  07860 | 973-383-7400 |
| Woodbury, NJ  08096 | | | |
| | | | |
| **Hudson County:** | | **Union County:** | |
| Deputy Clerk of the Superior Court | LAWYER REFERRAL | Deputy Clerk of the Superior Court | LAWYER REFERRAL |
| Brennan Courthouse - 1st Floor | 201-798-2727 | 1st Floor, Courthouse | 908-353-4715 |
| 583 Newark Avenue | LEGAL SERVICES | 2 Broad Street | LEGAL SERVICES |
| Jersey City, NJ  07306 | 201-792-6363 | Elizabeth, NJ  07207 | 908-354-4340 |
| | | | |
| **Hunterdon County:** | | **Warren County:** | |
| Deputy Clerk of the Superior Court | LAWYER REFERRAL | Deputy Clerk of the Superior Court | LAWYER REFERRAL |
| Civil Division | 908-735-2611 | Civil Division Office | 973-267-5882 |
| 65 Park Avenue | LEGAL SERVICES | Courthouse, 413 Second Street | LEGAL SERVICES |
| Flemington, NJ  08862 | 908-782-7979 | Belvidere, NJ  07823-1500 | 973-475-2010 |
| | | | |
| **Mercer County:** | | | |
| Deputy Clerk of the Superior Court | LAWYER REFERRAL | | |
| Local Filing Office, Courthouse | (609) 585-6200 | | |
| 175 South Broad St., P.O. Box 8068 | LEGAL SERVICES | | |
| Trenton, NJ  08650 | (609) 695-6249 | | |

# EXHIBIT C

## Crawford, Philip W.

**Subject:**                FW: Fuller v. Insys, et als

**Sent:** Wednesday, October 04, 2017 8:43 AM
**To:** Crawford, Philip W.
**Subject:** Fuller v. Insys, et als

Per your request please note that Linden Care LLC consents to removal from state to federal court. Linden Care LLC is an LLC with two members, both Delaware corporations. There are no NJ-based members. Thank you for your attention. Paul Schaaff

Sent from my Verizon, Samsung Galaxy smartphone

# EXHIBIT D

CONSOLE & HOLLAWELL, P.C.
Richard J. Hollawell, Esquire
Attorney I.D. No.: 018122001
Mark C. Dewland, Esquire
Attorney I.D. No.:023871986
Five Greentree Centre
525 Route 73 North, Suite 117
Marlton, New Jersey 08053
(856) 778-5500

Attorney for Plaintiff, Deborah Fuller & David
Fuller as Administrators Ad Prosequendum for
the Estate of Sarah A. Fuller, deceased, and
Deborah Fuller & David Fuller, Individually

| | | |
|---|---|---|
| DEBORAH FULLER & DAVID FULLER, as Administrators Ad Prosequendum for the Estate of SARAH A. FULLER, deceased and, DEBORAH FULLER, & DAVID FULLER, Individually | : : : : : : | SUPERIOR COURT OF NEW JERSEY LAW DIVISION<br><br>MIDDLESEX COUNTY<br><br>DOCKET NO.: L-1859-17 |
| Plaintiff(s) | : : | *Civil Action* |
| v. | : | |
| VIVIENNE MATALON, M.D., TLC HEALTHCARE 2, LLC, INSYS THERAPEUTICS, INC., LINDEN CARE, LLC INC., JOHN DOE, 1-10 (fictitious), ABC CORPORATION 1-10(fictitious), Individually, Jointly, Severally and/or in the Alternative | : : : : : : : : | |
| Defendant(s) | : : | |

## OFFER OF JUDGMENT PURSUANT TO RULE 4:58-1, ET SEQ.

**TO:**   Philip W. Crawford, Esquire
Gibbons P.C.
One Gateway Center
Newark, N.J. 07102-5310
*Attorney for Defendant, Insys Therapeutics, Inc.*

**PLEASE TAKE NOTICE** that the Plaintiffs, Deborah Fuller & David Fuller, as Administrator Ad Prosequendum for the Estate of Sarah A. Fuller, Deceased, and Deborah Fuller & David Fuller, Individually, hereby make offer to take judgment against the Defendant, Insys Therapeutics, Inc., for Five Million Dollars ($5,000,000.00) without prejudice, with costs accrued to the date hereof.

**TAKE FURTHER NOTICE** that if at any time prior to the tenth day before the captioned matter is actually tried before a Jury or 90 days from now (whichever is earlier) the within offer is accepted, notice of acceptance should be served upon the offer or herein and the clerk of Court.

**TAKE FURTHER NOTICE** that the making of the within offer is a withdrawal of all previous offers made by the undersigned. In the event the offer is not accepted on or prior to the tenth day before the actual trial date or within 90 days of service hereof (whichever is earlier), the within offer shall be deemed withdrawn.

**TAKE FURTHER NOTICE** that in the event judgment is recovered for more than the amount of the within offer, the undersigned shall apply for costs, interest and attorney's fees in accordance with Rule 4:58.

CONSOLE AND HOLLAWELL, P.C.

DATED: 05/26/2017

By:

**RICHARD J. HOLLAWELL, ESQUIRE**
Attorney for Plaintiffs

# EXHIBIT E

Case 2:17-cv-07877-ES-SCM Document 1-1 Filed 10/04/17 Page 77 of 98 PageID: 83
Calender v. NVR, Inc., Not Reported in F.Supp.2d (2011)
2011 WL 4593759

2011 WL 4593759
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

James S. CALENDER and
Diane Calender, Plaintiffs,
v.
NVR, INC., t/a Ryan Homes, et al., Defendants.

Civil Action No. 10–cv–4277 (NLH)(KMW).
|
Sept. 30, 2011.

**Attorneys and Law Firms**

Gary F. Piserchia, Esquire, Parker McCay P.A., Marlton, N.J., for Plaintiffs James S. Calender and Diane Calender.

Brian Michael Robinson, Esquire and Joseph Kernen, Esquire, DLA Piper L.L.P., Philadelphia, PA, David A. Haworth, Esquire, Ballard Spahr L.L.P., Cherry Hill, N.J., for Defendant NVR, Incorporated, t/a Ryan Homes.

**OPINION**

HILLMAN, District Judge.

**\*1** Plaintiffs, James S. Calendar and Diane Calender (hereafter, "Plaintiff"), [1] brought this action against Defendant, NVR, Incorporated (or, "Defendant" or "NVR"), trading as Ryan Homes, after James sustained injuries in a home he had recently purchased. The home was designed, manufactured, constructed, and sold by NVR. Plaintiff claims that he fell while exiting the attic through its access panel/opening. Plaintiff alleges that the attic's access panel/opening was unreasonably dangerous and defective, and states causes of action sounding in negligence (Count One), product liability and/or strict liability (Count Two), breach of contract (Count Three), breach of warranties (Count Four), and loss of consortium (Count Five). Presently before the Court is NVR's motion to dismiss Plaintiff's claims for failure to file an affidavit of merit insofar as those claims rely on a theory of design defect.

For the reasons expressed below, NVR's motion to dismiss Plaintiff's design defect claims under the New Jersey Affidavit of Merit Statute is granted.

**I. JURISDICTION**

This Court has jurisdiction pursuant to 28 U.S.C. § 1332. James and Diane Calender are citizens of the State of New Jersey. NVR is incorporated and maintains its principal place of business in the Commonwealth of Virginia. Therefore, complete diversity exists between the parties. The amount in controversy is met because the allegations contained in Plaintiff's complaint sufficiently demonstrate that damages sought are in excess of $75,000, exclusive of interest and cost. [2]

**II. BACKGROUND**

According to Plaintiff's complaint, NVR is "a corporation specializing in the sale, design and construction of residential homes and is a mass-developer and/or professional builder, specializing in constructing full communities." (Compl., ¶ 5). Plaintiff entered into an agreement with NVR to purchase a newly constructed home on March 23, 2008. NVR designed, manufactured, built, and sold the home purchased by Plaintiff. [3]

On or around October 21, 2008, Plaintiff accessed the home's attic in order to change the filters on air conditioning units and HVAC systems. While exiting the attic, Plaintiff fell through its access panel/opening, and suffered severe and permanent injuries.

Plaintiff commenced this action by filing a complaint against NVR on June 30, 2010, in the Superior Court of New Jersey, Law Division, Camden County. The complaint alleged, *inter alia,* that NVR: (1) negligently designed, manufactured, constructed, and/or sold the home; (2) is subject to product liability because the access panel/opening was unreasonably dangerous and defective, and/or due to the failure to adequately warn of such conditions; (3) breached its contract to provide a safe, suitable home; and (4) breached its express and implied warranties. The complaint also includes a *per quod* claim for loss of consortium, and a plea for punitive damages.

**\*2** NVR removed the suit to this Court on August 20, 2010. On January 21, 2011, NVR filed the motion to dismiss Plaintiff's complaint with respect to the design defect claims.

**III. DISCUSSION**

### A. Standard for Motion to Dismiss

When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Evancho v. Fisher,* 423 F.3d 347, 350 (3d Cir.2005). It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).

A district court, in weighing a motion to dismiss, asks " 'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim.' " *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 563 n. 8, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Scheuer v. Rhoades,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)); *see also Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1953, 173 L.Ed.2d 868 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions[.]' " (citation omitted)). Under the *Twombly/Iqbal* standard, the Third Circuit has instructed a two-part analysis. First, a claim's factual and legal elements should be separated; a "district court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210–11 (3d Cir.2009) (citing *Iqbal,* 129 S.Ct. at 1950).

Second, a district court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.' " *Id.* at 211 (quoting *Iqbal,* 129 S.Ct. at 1950). "[A] complaint must do more than allege the plaintiff's entitlement to relief." *Id.; see also Phillips v. County of Allegheny,* 515 F.3d 224, 234 (3d Cir.2008) ("The Supreme Court's *Twombly* formulation of the pleading standard can be summed up thus: 'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." (quoting *Twombly,* 550 U.S. at 556)). The defendant bears the burden of showing that no claim has been presented. *Hedges v. U.S.,* 404 F.3d 744, 750 (3d Cir.2005).

### B. The New Jersey Affidavit of Merit Statute

Defendant argues that to the extent Plaintiff's claims allege or rely on design defects, those claims must be dismissed because Plaintiff did not file an affidavit of merit. By Defendant's estimation, an affidavit of merit is necessary for any design defect claims in this case because those claims implicate professional negligence involving a licensed professional, an architect.

**\*3** Plaintiff counters that no affidavit of merit is required here because Plaintiff need not show any deviation in an architect's professional standard of care, but rather must demonstrate only that the product was defective. Plaintiff does not believe that any expert testimony is necessary to carry that burden. Also, Plaintiff submits that no licensed person, as contemplated by the Affidavit of Merit Statute, is a defendant in this case.

### 1. Applicability and Scope

The Third Circuit has concluded that the New Jersey Affidavit of Merit Statute ("the AMS"), N.J.S.A. § 2A:53A–26 *et seq.,* at issue in the instant case, constitutes substantive state law. *Chamberlain v. Giampapa,* 210 F.3d 154, 161 (3d Cir.2000). As such, the AMS "must be applied by federal courts sitting in diversity," as is the case here. [4] *Id.* The AMS reads in pertinent part:

> In any action for damages for personal injuries ... resulting from an alleged act of malpractice or negligence by a licensed person in his profession or occupation, the plaintiff shall, within 60 days following the date of filing of the answer to the complaint by the defendant, provide each defendant with an affidavit of an appropriate licensed person that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional or occupational standards or treatment practices.

N.J.S.A. § 2A:53A–27. The AMS provides guidance by defining a "licensed person." N.J.S.A. § 2A:53A–26. This list includes architects, doctors, and engineers, among other professionally licensed occupations. *Id.*

The New Jersey courts have interpreted the main purpose of the AMS as "requir [ing] plaintiffs in malpractice cases to make a threshold showing that their claim is meritorious, in order that meritless lawsuits readily could

be identified at an early stage of litigation." *In re Petition of Hall,* 147 N.J. 379, 688 A.2d 81, 87 (N.J.1997). Put differently, the thrust of the AMS is "to weed out frivolous lawsuits early in the litigation while, at the same time, ensuring that plaintiffs with meritorious claims will have their day in court." *Hubbard v. Reed,* 168 N.J. 387, 774 A.2d 495, 500 (N.J.2001). The New Jersey courts also have understood a goal of the AMS to be that "the resources and time of the parties will not be wasted by the continuation of unnecessary litigation." *Knorr v. Smeal,* 178 N.J. 169, 836 A.2d 794, 798 (N.J.2003). The New Jersey Supreme Court has cautioned, though, that the AMS should *not* serve " 'to create a minefield of hyper-technicalities in order to doom innocent litigants possessing meritorious claims.' " *Ferreira v. Rancocas Orthopedic Assocs.,* 178 N.J. 144, 836 A.2d 779, 783 (N.J.2003) (quoting *Mayfield v. Cmty. Med. Assocs.,* 335 N.J.Super. 198, 762 A.2d 237, 244 (N.J.App.Div.2000)).

Failure to provide an affidavit of merit in the required instances and within the prescribed time period will be deemed a failure to state a cause of action. N.J.S.A. § 2A:53A–29. When a complaint is dismissed under the AMS, it is done "with prejudice," and "[s]uch a dismissal concludes the rights of the parties as if the suit had been prosecuted to final adjudication adverse to the plaintiff." *Cornblatt v. Barow,* 153 N.J. 218, 708 A.2d 401, 413 (N.J.1998) (citation and internal quotation marks omitted).

### 2. Substantive Analysis of New Jersey Affidavit of Merit Statute

**\*4** On its face, the statutory language does not support the contention that the AMS is applicable to claims other than those sounding in malpractice or negligence. *See* N.J.S.A. § 2A:53A–27 ("In any action for damages ... resulting from an alleged act of malpractice or negligence ..."). However, the New Jersey Supreme Court has repeatedly asserted that, when deciding whether an affidavit of merit is required, the courts should focus on the nature of the legal inquiry rather than on the label placed on the action. *See, e.g., Couri v. Gardner,* 173 N.J. 328, 801 A.2d 1134, 1141 (N.J.2002). "[R]ather than focusing on whether the claim is denominated as tort or contract, ... courts should determine if the claim's underlying factual allegations require proof of a deviation from the professional standard of care applicable to that specific profession ." *Id.* "If such proof is required, an

affidavit of merit is required for that claim, unless some exception applies." *Id.*

In order to assist courts in determining whether an affidavit of merit is required, the *Couri* Court articulated a three-element test. Courts should ask:

(1) whether the action is for "damages for personal injuries, wrongful death or property damage" (nature of injury); (2) whether the action is for "malpractice or negligence" (cause of action); and (3) whether the "care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint [ ] fell outside acceptable professional or occupational standards or treatment practices" (standard of care).

*Id.* at 1137 (quoting N.J.S.A. § 2A:53A–27). If all three elements are satisfied, then the claim falls within the purview of the AMS, and the affidavit is required.

### C. Application of the AMS to Plaintiff's Claims

As all three of the *Couri* elements are satisfied with regard to Plaintiff's design defect claims, the AMS applies and an affidavit of merit is required.

#### 1. Defendant is a "licensed person" within the meaning of the AMS, satisfying the first *Couri* element.

Plaintiff argues that, having named the construction company in his complaint rather than the individual architect employed by the company, the AMS does not apply because the company is not a "licensed person." The AMS, however, must be interpreted more broadly than Plaintiff's restricted reading. The substance of Plaintiff's design defect theory implicates, directly or indirectly, Defendant's architectural expertise and, in turn, its architects and their judgment. To allow Plaintiff "to circumvent the affidavit requirement by naming only" an entity—in this matter, NVR—as a defendant in lieu of the architect responsible for designing the access panel/opening, would lead to an " 'entirely anomalous' " result, consequently bypassing the affidavit requirement due to an overly technical reading of the statute. *Shamrock Lacrosse, Inc. v. Klehr, Harrison, Harvey, Branzburg & Ellers, L.L.P.,* 416 N.J.Super. 1, 3 A.3d 518, 532 (N.J.App.Div.2010). The AMS focuses "on the resulting harm, not on the business forms of the named defendants." *Id.* at 531. "A statute should not be read

in a crabbed fashion that leads to anomalous results." *Id.* at 532–33. Allowing this sort of exception would encourage plaintiffs to file tort actions without regard for the important statutory tort reform requirements imposed by the New Jersey Legislature. And, after all, an individual employee's negligence within the scope of his employment may be imputed to the employer under the doctrine of *respondeat superior. See Martin v. Perini Corp.,* 37 F.Supp.2d 362, 366 (D.N.J.1999).

**\*5** Moreover, a business composed of licensed individuals may itself be considered a "licensed person" within the meaning of the AMS. *See, e.g., Shamrock Lacrosse,* 416 N.J.Super. 1, 3 A.3d at 532 (ruling that it would be "anomalous" to circumvent the AMS requirement by simply naming a law firm as defendant rather than the individual lawyer whose alleged malpractice is implicated, therefore considering a law firm a "licensed person" under the AMS); *Bonnieview v. Homeowners Ass'n, LLC v. Woodmont Builders, LLC,* 2005 WL 2469665 (D.N.J.2005) (holding that a company composed of licensed environmental engineers is considered a "licensed person" for purposes of affidavit of merit requirement); *Martin,* 37 F.Supp.2d at 366 (holding that "a business organization whose leadership is composed of 'licensed persons' within the meaning of N.J.S.A. 2A:53A–26 is also considered a 'licensed person' for purposes of the AMS). Here, the conduct of a licensed professional—the architect who designed the attic access panel/opening—is clearly at issue. In fact, Plaintiff names "John Does # 1–10" in his complaint, and explicitly states that they "are pled to temporarily suffice for the presently undetermined identities of such persons, contractors, subcontractors, *designers, architects,* [etc.] ... *who participated in the design, manufacture, construction, planning,* [etc.] ... of the house." (Compl., ¶ 3) (emphasis added). Plaintiff cannot avoid the vital involvement of the "licensed person" at the heart of his design defect claims in order to excuse the absence of an affidavit of merit.

For all the foregoing reasons, NVR is considered a "licensed person" within the scope of the AMS.

### 2. Plaintiff is seeking damages for personal injuries, satisfying the second *Couri* element.

As indicated by the plain language of the statute, N.J.S.A. § 2A:53A–27 ("In any action for damages for personal injuries ..."), and reinforced via the second *Couri* element, the action must be one seeking damages for personal

injuries in order for the AMS to apply. In the present case, Plaintiff clearly seeks damages for personal injuries. As such, the second *Couri* element is satisfied.

### 3. Because proving a design defect claim requires expert testimony regarding a professional standard of care and conduct, the third *Couri* element is satisfied.

The third *Couri* element makes the Court ask "whether the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint fell outside acceptable professional or occupational standards or treatment practices." *Couri,* 801 A.2d at 1137 (citation, internal quotation marks, and brackets omitted). Following the mandates of *Couri,* in order to assess this it is crucial to examine the nature of the claim at issue—the design defect.

In essence, one theory of Plaintiff's claims is that the attic access panel/opening was designed or planned defectively. In New Jersey, *only* registered architects or licensed engineers are permitted to design a home's plans and specifications.[5] In claiming that NVR's building plans were designed defectively, Plaintiff presupposes that the "care, skill or knowledge exercised or exhibited ... in the ... work" of the licensed architect "fell outside acceptable professional or occupational standards." *Id.* In essence, the design defect aspect of Plaintiff's claim is one of professional malpractice or negligence in the field of architecture. Clearly, such claims were meant to be protected by the AMS as demonstrated by not only the plain language of the AMS but also the case law interpreting it.

**\*6** In order to prove the existence of a duty and that NVR—and, more specifically, its architect—breached its professional standard of care in designing the attic access panel/opening, Plaintiff would have to rely on the expert testimony of another licensed architect, a registered engineer, or an expert of comparable skill or knowledge. Assessing the existence or alleged breach of a duty of care regarding an architectural design defect clearly "concern[s] a subject matter that is beyond the ken of the average juror." *Hisenaj v. Kuehner,* 194 N.J. 6, 942 A.2d 769, 774 (N.J.2008). It is true that the "doctrine of common knowledge permits exception to the general rule," *Estate of Chin v. St. Barnabas Med. Ctr.,* 160 N.J. 454, 734 A.2d 778, 785 (N.J.1999), allowing a jury, through common knowledge and experience, "to

conclude without expert testimony that a standard of care applied and was breached," *Lucia v. Monmouth Med. Ctr.,* 341 N.J.Super. 95, 775 A.2d 97, 103 (N.J.App.Div.2001). However, the common knowledge doctrine is only applicable "where the carelessness of the defendant is readily apparent to anyone of average intelligence and ordinary experience." *Rosenberg v. Cahill,* 99 N.J. 318, 492 A.2d 371, 375 (N.J.1985). The architectural design defects in this case are of a complex nature, involving instrumentalities the details and nuances of which are not readily apparent, and thus cannot be said to fall within this exception. *See Rocco v. N.J. Transit Rail Operations, Inc.,* 330 N.J.Super. 320, 749 A.2d 868, 879 (N.J.App.Div.2000) (noting that when a case "involves a complex instrumentality, expert testimony is needed in order to help the fact-finder understand 'the mechanical intricacies of the instrumentality' and help to exclude other possible causes of the accident" (quoting *Jimenez v. GNOC Corp.,* 286 N.J.Super. 533, 670 A.2d 24, 30 (N.J.App.Div.1996))). [6]

This conclusion is further borne out by an examination of the proof necessary for a negligence-based products liability claim and a strict liability claim under New Jersey law. [7] The elements of proof under a strict liability theory are that "(1) the product design was defective; (2) the defect existed when the product was distributed by and under the control of defendant; and (3) the defect caused injury to a reasonably foreseeable user." *Michalko v. Cooke Color & Chem. Corp.,* 91 N.J. 386, 451 A.2d 179, 183 (N.J.1982). In order to prove the first prong—that the product design was defective—it is necessary to employ a risk-utility analysis. *Cepeda v. Cumberland Engineering Co., Inc.,* 76 N.J. 152, 386 A.2d 816, 826 (N.J.1978), *rev'd. on other grounds, Suter v. San Angelo Foundry & Mach. Co.,* 81 N.J. 150, 406 A.2d 140 (N.J.1979). Factors to be considered in the risk-utility analysis include:

(1) The usefulness and desirability of the product, its utility to the user and to the public as a whole.

(2) The safety aspects of the product, the likelihood that it will cause injury, and the probable seriousness of the injury.

(3) The availability of a substitute product which would meet the same need and not be as unsafe.

**\*7** (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.

(5) The user's ability to avoid danger by the exercise of care in the use of the product.

(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.

(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

*Id.* at 826–27 (citing John Wade, "On The Nature of Strict Tort Liability For Products," 44 Miss. L.J. 825, 837–838 (1973)). Under a negligence-based product liability theory, the plaintiff not only examines the care or skill of the designer, but also " 'must prove under a risk-utility analysis the existence of an alternate design that is both practical and feasible,' and 'safer' than that used by the manufacturer." *Diluzio–Gulino v. Daimler Chrysler Corp.,* 385 N.J.Super. 434, 897 A.2d 438, 441 (N.J.App.Div.2006) (quoting *Lewis v. Am. Cyanamid Co.,* 155 N.J. 544, 715 A.2d 967, 980 (N.J.1998)).

Proceeding under either rubric, it is clear that in the instant case, Plaintiff is necessarily challenging the architectural designs and plans—which only the licensed architect was able to craft. In order to do so, he would need the expert testimony of another licensed architect or a comparable expert. For example, under the strict liability design defect rubric, Plaintiff would first need to prove that the product design was defective. *See Michalko,* 451 A.2d at 183. This necessarily entails an analysis of the design plans, an assessment that could only be performed by an expert capable of opining on the professional standard of care. Similarly, under either design defect theory, it would be necessary to propose a safer, alternative design. This, too, would necessarily entail expert testimony. The testimony would have to compare the safer alternate design with the allegedly unsafe earlier design, thereby demanding an examination of the original architect's work product and, as such, the care or skill with which he designed the access panel/opening. Without such referential testimony, it would be difficult to satisfy the "safer alternate design" requirement. And, of course, the negligence-based theory

of product liability, by its definition and nature, must delve into the professional standard of care and determine whether any deviation from that standard has occurred.

It therefore is clear that proof of a design defect in this case would require expert testimony of a licensed architect, engineer, or other expert that addresses the "care, skill or knowledge exercised or exhibited" in the design. *Couri,* 801 A.2d at 1137 (citation and internal quotation marks omitted). In order to succeed, the expert testimony would have to assert that the prior architectural design work "fell outside acceptable professional or occupational standards or treatment practices." *Id.* (citation and internal quotation marks omitted). For all the foregoing reasons, the third *Couri* element is satisfied.

**4. The AMS applies to Plaintiff's design defect theory, and as such, an affidavit of merit was required.**

 **\*8**  All three *Couri* elements are satisfied. First, the defendant is considered a "licensed person." Second, the claim seeks damages for personal injury. Third, the nature of the claim necessarily involves a contention about the professional standard of care for a protected, licensed class—architect. As all three elements are satisfied, the AMS applies to the Plaintiff's design defect claim. An affidavit of merit was therefore required to proceed under that theory of liability. It is undisputed, however, that Plaintiff did not file an affidavit of merit.

As stated above, failure to file an affidavit of merit in the required instances will result in dismissal with prejudice of the claim. *Cornblatt,* 708 A.2d at 413. Defendant notes, and Plaintiff seems to disregard, that Defendant's motion to dismiss is only to the extent that the counts are based on design defect allegations. In fact, Defendant concedes that the AMS does not apply to certain of Plaintiff's other causes of action, repeatedly acknowledging, expressly and

impliedly, the limited scope of the motion to dismiss and the application of the AMS to this case.

Therefore, to the extent that Plaintiff's theories of liability are based on design defect, they are dismissed. The practical effect of this ruling is that Plaintiff is precluded from trying to establish the existence of, or rely on a theory of, design defect. Absent an affidavit of merit, Plaintiff cannot proceed in any way on such a claim.

However, Plaintiff's claims that are separate and apart from design defect—manufacturing defect, failure to warn, breach of express warranty, [8] and breach of contract—are still viable at this time. The Court does not read Defendant's motion as challenging any of those other claims. Moreover, it may be possible to establish those claims absent any allegation of design defect. *See, e.g., Myrlak v. Port Auth. of N.Y. & N.J.,* 157 N.J. 84, 723 A.2d 45, 52 (N.J.1999) (allowing a plaintiff to prove a manufacturing defect using direct evidence, including expert testimony, or circumstantial evidence). Therefore, Defendant's motion is granted, and Plaintiff is precluded from pursing his causes of action under a theory of design defect.

*IV. CONCLUSION*

For all the foregoing reasons, Plaintiff's design defect claims fall under the purview of the New Jersey Affidavit of Merit Statute, N.J.S.A. § 2A:53A–26 *et seq.* Due to Plaintiff's failure to file an affidavit of merit to support this portion of his complaint, Defendant's motion to dismiss is granted. Plaintiff may proceed with his action only to the extent that it in no way relies on or attempts to establish the existence of a design defect.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4593759

---

Footnotes

1    Though both James and Diane Calender are named as plaintiffs, the relevant events and the majority of claims in this case involve only James Calender. Thus, in the interests of clarity and simplicity, and unless otherwise noted, the Court will refer to a singular "Plaintiff," while recognizing that both Calenders are plaintiffs in this matter.

2    Plaintiff's complaint does not articulate a particular amount in controversy. But, as Defendant correctly opines and Plaintiff ostensibly agrees, "a reasonable reading of the value of the rights being litigated" suggests that the amount in controversy may exceed $75,000. *Angus v. Shiley, Inc.,* 989 F.2d 142, 146 (3d Cir.1993). Plaintiff alleges that he suffered severe and permanent bodily injuries. There is no reason to doubt that the amount of damages associated with such injuries,

including pain and suffering, medical expenses, and loss of wages, could exceed the minimum threshold in a diversity-ofcitizenship case.

3    In its submissions to the Court, Defendant represents that, in accordance with New Jersey law, the home's architectural plans were designed, reviewed, and approved by Lawrence T. Bassett, a New Jersey licensed architect employed by NVR. The Court does not rely on this fact for its analysis, but mentions it simply to highlight the obvious, as discussed *infra*: an architect must design building plans.

4    "A [federal] court will consider the New Jersey legislature's purpose for enacting such a statute, as well as how the New Jersey courts have interpreted and applied the statute." *Fink v. Ritner,* 318 F.Supp.2d 225, 228 (D.N.J.2004). As such, this Opinion will rely on New Jersey legislative and judicial treatment of the AMS.

5    Under the New Jersey Building Code, N.J.A.C. § 5:23–2.21,

> (b) Professional architecture or engineering services:
>
> 1. Design: All new, renovation, alteration, reconstruction, expansion, addition or modification work involving the practice of professional architecture or engineering, as defined by the statutory requirements of the professional registration and licensing laws of this State, shall be prepared by registered architects or licensed engineers. All plans, computations and specifications required for a construction permit application must be prepared by or under the direct supervision of a registered architect or licensed engineer and bear his or her signature and seal in accordance with the State's statutes and regulations governing the professional registration and licensing of architects and engineers.

N.J.A.C. § 5:23–2.21(b)(1).

6    A brief survey of product liability cases leads to the conclusion that, for purposes of a design defect claim, an attic access panel/opening constitutes a complex instrumentality in need of expert testimony. *See, e.g., Scanlon v. General Motors Corp., Chevrolet Motor Div.,* 65 N.J. 582, 326 A.2d 673, 677 (N.J.1974) (finding that an automobile is a complex instrumentality requiring expert testimony); *Wojcik v. Borough of Manville,* 2010 WL 322893 (N.J.App.Div.2010) (motorcycle helmet as complex instrumentality); *Tluczek v. Prestige BMW of Ramsey,* 2009 WL 2601625 (N.J.App.Div.2009) (steering column); *Huszar v. Greate Bay Hotel & Casino, Inc.,* 375 N.J.Super. 463, 868 A.2d 364 (N.J.App.Div.2005) (elevator door); *Lauder v. Teaneck Volunteer Ambulance Corps,* 368 N.J.Super. 320, 845 A.2d 1271 (N.J.App.Div.2004) (hospital gurney); *Gore v. Otis Elevator Co.,* 335 N.J.Super. 296, 762 A.2d 292 (N.J.App.Div.2000) (elevator); *Rocco,* 330 N.J.Super. 320, 749 A.2d 868 (lock/unlock mechanism on a train door);; *Hunt v. Kmart,* 2006 WL 799189 (N.J.App.Div.2006) (lawn chair); *but see, e.g., Henning v. Casa DiBertacci, Inc.,* 2007 WL 1461170 (N.J.App.Div.2007) (finding that a cardboard box is *not* a complex instrumentality requiring expert testimony, falling instead within the common knowledge exception); *Mathews v. University Loft Co.,* 387 N.J.Super. 349, 903 A.2d 1120 (N.J.App.Div.2006) (finding that the danger of falling off a bunk bed is open and obvious, not requiring expert testimony); *Warrington v. Paint Creek Supply, Inc.,* 2008 WL 51459 (N.J.App.Div.2008) (finding that a latch is *not* a complex instrumentality).

7    The New Jersey Products Liability Act, codified at N.J.S.A. § 2A:58C–1 *et seq.* provides in pertinent part:

> A manufacturer or seller of a product shall be liable in a product liability action only if the claimant proves by a preponderance of the evidence that the product causing the harm was not reasonably fit, suitable or safe for its intended purpose because it: a. deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae, or b. failed to contain adequate warnings or instructions, or c. was designed in a defective manner.

N.J.S.A. § 2A:58C–2. Plaintiff seems to suggest that, because this claim was brought pursuant to and falls under the Products Liability Act, it is somehow precluded from the strictures of the AMS. However, the only case that Plaintiff cites in support of this contention, *Darwin v. Gooberman,* 339 N.J.Super. 467, 772 A.2d 399 (N.J.App.Div.2001), was specifically overturned by the New Jersey Supreme Court on the basis of that contention. *See Couri,* 801 A.2d at 1141 (holding that it is not the label attached to the claim, but the substance of that claim which should inform the application of the AMS).

8    To the extent that the underlying claim is based on a defective product (rather than negligence in construction or installation), and hence governed by the Products Liability Act, breach of implied warranty and negligence are not viable claims. "[T]he PLA 'no longer recognizes negligence or breach of warranty (with the exception of an express warranty) as a viable separate claim for 'harm[,]' [including personal injury,] caused by a defective product' or an inadequate warning." *Koruba v. Am. Honda Motor Co. .,* 396 N.J.Super. 517, 935 A.2d 787, 795 (N.J.App.Div.2007) (quoting *Tirrell v. Navistar Int'l, Inc.,* 248 N.J.Super. 390, 591 A.2d 643, 647 (N.J.App.Div.1991)). "Rather, the exclusive method to prosecute such a claim is ... by proving that the product was not reasonably fit, suitable or safe for its intended purpose because it either contained a manufacturing defect, failed to contain adequate warnings or instructions, or was designed in a defective

2011 WL 4593759

manner." *Id.* It is therefore not possible to assert breach of implied warranty or negligence as separate claims to the extent that they are based on the product itself.

---

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT F

DOMINIC A. DELAURENTIS, JR.*
DAVID P. BRIGHAM
ROBERT D. BROWN
MARCIA STANDER FREEDMAN**
JOHN A. TALVACCHIA*

# STAHL & DeLAURENTIS, P.C.
### ATTORNEYS AT LAW

10 E. CLEMENTS BRIDGE ROAD
RUNNEMEDE, NJ  08078

(856) 380-9200
FAX: (856) 939-1354
VISIT OUR WEB SITE: WWW.STAHL-DELAURENTIS.COM

SHARON K. GALPERN
BRYAN GASTER+
ERICA L. BUSCH
MICHAEL C. PACHOLSKI

* Certified by the Supreme Court of
  New Jersey as a Civil Trial Attorney
** Certified by the Supreme Court of New
  Jersey as a Workers' Compensation
  Law Attorney
+  Of Counsel

**E-mail:  @sdnjlaw.com**
**Direct Dial (856) 402-2569**
**Assistant: 856-402-2561**

File No.:  17677

September 28, 2017

Clerk, Law Division
Middlesex County Courthouse
56 Paterson Street
P.O. Box 964
New Brunswick, NJ 08903-0964

Re:  Fuller v. Matalon

Dear Sir/Madam:

Enclosed please find an executed Stipulation of Dismissal with Prejudice as to my clients, Vivienne Matalon, M.D. and TLC Healthcare2, LLC, in regard to the above matter.  I would ask that the Court kindly file said Stipulation of Dismissal at this time.

Should you have any questions or concerns, please do not hesitate to contact my office.

Respectfully submitted,

Dominic A. DeLaurentis, Jr.

DAD/jb
Encl.
Cc:  Richard J. Hollawell, Esq.

**STAHL & DeLAURENTIS, P.C.**

File #: 17677

BY:   Dominic A. DeLaurentis, Esq.
        Douglas C. Maute, Esq.
**ATTY I.D. #:** 025291984
               016152009
10 E. CLEMENTS BRIDGE ROAD
RUNNEMEDE, NEW JERSEY 08078
(856) 380-9200
ATTORNEY   FOR   Defendants,   Vivienne
Matalon, MD and TLC Healthcare2, LLC

| | |
|---|---|
| DEBORAH FULLER & DAVID FULLER, as Administrators Ad Prosequendum for the Estate of SARAH A. FULLER, deceased and DEBORAH FULLER & DAVID FULLER, Individually<br>*Plaintiffs*<br><br>*vs.*<br><br>VIVIENNE   MATALON,   MD,   TLC HEALTHCARE   2,   LLC,   INSYS THERAPEUTICS, INC., LINDEN CARE, LLC INC., JOHN DOE 1-10 (fictitious), ABC CORPORATION 1-10 (fictitious), Individually, Jointly Severally and/or in the alternative<br>*Defendants* | SUPERIOR COURT OF NEW JERSEY<br><br>MIDDLESEX COUNTY<br><br>Docket No.: L-1859-17<br><br>CIVIL ACTION<br><br>**STIPULATION OF DISMISSAL WITH PREJUDICE** |

THE MATTER in difference in the above entitled action having been amicably adjusted by and between the parties, it is hereby stipulated and agreed that the same be and is hereby dismissed, **with prejudice,** and without costs against either party as to the defendants, Vivienne Matalon, MD and TLC Healthcare2, LLC

By: *Richard J. Hollawell*          Dated: _9/28/17_
      Richard J. Hollawell, Esq.
      Console & Hollawell, P.C.
      Attorney(s) for Plaintiff(s)

By: _____       Dated: ___9/28/17___
   Dominic A. DeLaurentis, Jr., Esq.
   Attorney for Defendants,
   Vivienne Matalon, MD and TLC Healthcare2, LLC

# EXHIBIT G

2013 WL 11066484
Only the Westlaw citation is currently available.
United States District Court,
D. New Jersey.

Dr. Joseph Piacentile, Plaintiff,

v.

Gregory Thorpe, Blair Hamrick, Thomas
Gerahty, and Matthew Burke, Defendants.

Civil Action No. 12-CV-7156-ES-SCM
|
Signed 8/29/2013
|
Filed 08/30/2013

## REPORT AND RECOMMENDATION
## ON MOTION FOR REMAND [D.E. 11]

STEVEN C. MANNION, United States Magistrate
Judge

### I. *INTRODUCTION*

 *1  This matter comes before the Court on the motion
of plaintiff Joseph Piacentile to remand this action to the
Superior Court of New Jersey, Law Division pursuant to
28 U.S.C. §§ 1331 and 1441(a). (D.E.11). Defendant Greg
Thorpe opposes remand. (D.E.19). He argues that this
Court has subject matter jurisdiction on both diversity and
federal question.

Pursuant to Local Civil Rule 72.1(a)(2), the Honorable
Esther Salas, United States District Judge, has referred
these motions to the undersigned for report and
recommendation. The Court held oral argument on this
matter on August 12, 2013. For the reasons set forth
herein, the undersigned recommends granting the motion
to remand.

### II. *BACKGROUND*

This is a breach of contract action brought by plaintiff,
Dr. Joseph Piacentile ("Plaintiff") on October 12, 2012. [1]
(D.E.1–1, Complaint). Plaintiff originally filed suit under
seal in the Superior Court of New Jersey, Law Division,
Bergen County against defendants Greg Thorpe, Blair
Hamrick, Thomas Gerahty, and Matthew Burke. (*Id.* at

*3). The Complaint alleged, *inter alia,* that Plaintiff and
defendant Burke are both residents of New Jersey, and
that the four defendants allegedly failed to honor an
agreement to share in the recovery from *qui tam* suits filed
under the False Claims Act, 31 U.S.C. § 3729, et seq. (*See
id.* at *7–10). Plaintiff's Complaint alleges that he suffered
damages in the amount of $3,347,860.10 or more from
defendants' respective breaches. (*Id.* at ¶ 47).

On or about October 30, 2012, defendant Thorpe
("Defendant") received a copy of the Summons and
Complaint at his residence in Mountain Home, Arkansas.
(D.E. 1, Notice of Removal at ¶ 2). Plaintiff then filed
a notice of voluntary dismissal of his claims against
defendants Hamrick, Gerahty, and Burke on November
8, 2012, without prejudice in the Superior Court of
New Jersey. (D.E. 11–1, Ex. A. to Plaintiff's Motion to
Remand, at 32). The Notice was signed by counsel for
plaintiff. (*Id.*)

Noting that Plaintiff had "settled with [the three other]
defendants and [...] dismissed his claims against them,"
Defendant filed a notice of removal with this Court
on November 15, 2012, based upon diversity jurisdiction.
(D.E. 1, Notice of Removal at ¶ 1). His filing included
the notice of removal, a copy of the complaint, defendant
Thorpe's declaration, and a civil cover sheet. (*See id.*).
Plaintiff responded in this Court on December 11, 2012,
by moving for remand. (D.E.11). Shortly thereafter,
Defendant opposed the motion to remand and argued
Federal question jurisdiction for the first time. (D.E. 19,
D. Br. at *12).

### III. *DISCUSSION*

Prior to addressing the motion to remand, the parties
should note that the caption in this matter was framed
by the complaint removed to this Court. (*See* D.E. 1–1,
Compl. at *3). A caption may be changed by the Court
upon motion by either party, but until then the caption
cannot be changed without leave of the Court. The parties
have modified the caption without leave of Court and will
hereafter use the appropriate caption in these proceedings.

#### A. Remand

 *2  State court defendants enjoy a statutory right to
remove certain civil actions to federal court. 28 U.S.C. §
1441 (sets forth the right to removal); 28 U.S.C. § 1446
(sets forth the procedure for effectuating removal from

state court to federal court). Plaintiffs and other parties enjoy a corollary statutory right to move for remand to state court. 28 U.S.C. § 1447. If the predicate of a motion to remand is a defect in a defendant's execution of the removal procedure, the moving party must file said motion within thirty days of the defendant's filing of the notice of removal. 28 U.S.C. § 1447(c). The same statute that sets forth this temporal limitation also makes clear that a party cannot waive the right to seek remand on the grounds that there is no federal subject matter jurisdiction.

Indeed, this Court has "a continuing obligation to monitor jurisdiction," and can order remand *sua sponte* upon finding that neither federal question nor diversity of citizenship jurisdiction exist in a removed action. *See Steel Valley Authority v. Union Switch & Signal Div.,* 809 F.2d 1006, 1010 (3d Cir.1987), *cert. dismissed sub nom American Standard, Inc. v. Steel Valley Authority,* 484 U.S. 1021, 108 S.Ct. 739, 98 L.E.2d 756 (1988); *see also Mitchell v. Village Super Market, Inc.,* 926 F.Supp. 476 (D.N.J.1996).

**B. Removal**

Pursuant to § 1441(a), "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States[.]" 28 U.S.C. § 1441(a); *see also Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). Stated differently, a defendant can remove an action to federal court pursuant to § 1441(a) if the plaintiff could have brought it here in the first instance. Thus, actions that could have been brought in federal court on diversity of citizenship grounds (pursuant to 28 U.S.C. § 1332) and those that raise federal questions (pursuant to 28 U.S.C. § 1331) are "removable." *Id.*

After a defendant effectuates the notice provisions set forth in 28 U.S.C. § 1446, the federal district court acquires full and exclusive subject matter jurisdiction over the litigation. 28 U.S.C. § 1446(d). On a motion to remand, this Court considers its own authority to hear a case consistent with the restrictions set forth in 28 U.S.C. § 1441(a). *Railway Labor Executive Ass'n. v. Pittsburgh & Lake Erie R.R. Co.,* 858 F.2d 936, 940–41 (3d Cir.1988).

Removal statutes are strictly construed against removal, and all doubts should be resolved in favor of remand. *Abels v. State Farm Fire & Casualty Co.,* 770 F.2d 26, 29 (3d Cir.1985); *Entrekin v. Fisher Scientific Inc.,* 146

F.Supp.2d 594, 604 (D.N.J.2001); *Ferraro v. Bell Atlantic Co.,* 955 F.Supp. 354, 356 (D.N.J.1997) (Fisher, J.) (citing *Sun Buick, Inc. v. Saab Cars USA, Inc.,* 26 F.3d 1259, 1267 (3d Cir.1994)). The removing defendant, as the party seeking to preserve federal jurisdiction, carries the burden of establishing that removal was proper. *Samuel–Bassett v. KIA Motors Am., Inc.,* 357 F.3d 392, 396 (3d Cir.2004); *Boyer v. Snap–On Tools Co.,* 913 F.2d 108, 111 (3d Cir.1992). Stated otherwise, the party seeking to remove bears the burden of proving that it has met the requirements for removal. *Group Hospitalization & Med. Servs. v. Merck–Medco Managed Care, LLP,* 295 F.Supp.2d 457, 461–462 (D.N.J.2003).

**C. Procedural Deficiencies**

To effectuate removal, a defendant "shall file" a "notice of removal [...] containing a short plain statement of the grounds for removal [...] together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action." 28 U.S.C. § 1446(a). The notice of removal must be filed within thirty days of receipt, through service or otherwise, of a copy of the pleading, motion, order, or other paper from which the defendant could first ascertain that the case has become subject to federal subject matter jurisdiction. 28 U.S.C. § 1446(b).

**\*3** Here, Defendant Thorpe received a summons with the complaint, but failed to include the summons and notice of dismissal with his notice of removal as required by 28 U.S.C. § 1446(a). (*See* D.E. 1, Notice of Removal). We need not decide whether those defects would provide a basis for remand or if such defects could be cured, however, because the procedural defects were not raised by Plaintiff's motion to remand and are therefore waived. [2] *See Korea Exchange v. Trackwise Sales Corp.,* 66 F.3d 46, 50–51 (3d Cir.1995) (a defect in the removal procedure is waived if not raised within 30 days by remand motion). This thirty-day time limit applies to remand motions as well as *sua sponte* orders for remand. *Id.* (citing 28 U.S.C. § 1447(c)).

**D. Federal Question Jurisdiction**

Defendant asserts for the first time in his opposition to remand that this Court has Federal question jurisdiction. (D.E. 19, D.Br. at *12). Defendant has acknowledged not raising this issue in his notice of removal. (*Id.*). In addition, at oral argument defense counsel admitted that

2013 WL 11066484

their primary argument for jurisdiction is diversity, not Federal question. The Court need not consider the merits of the Federal question argument, however, because the argument was waived when it was not raised within the thirty-day window. *See, e.g., Akins v. Radiator Specialty Co.,* 2006 U.S. Dist. LEXIS 71076, *4–5 (W.D.Pa.2006) (citing *USX Corp. v. Adriatic Ins. Co.,* 345 F.3d 190, 205–206 n. 11 (3d Cir.2003)); *ARCO Envtl. Remediation, L.L.C. v. Department of Health and Envtl Quality of the State of Montana,* 213 F.3d 1108, 1117 (9 th Cir.2000) ("The Notice of Removal 'cannot be amended to add a separate basis for removal jurisdiction after the thirty day period.' ") (quoting *O'Halloran v. University of Washington,* 856 F.2d 1375, 1381 (9 th Cir. 1988)); 16–107 Moore's Federal Practice—Civil § 107.30 ("A notice of removal may be freely amended within the 30–day period in which the notice must be filed. Further amendment may be permitted after the 30–day period if the amendment corrects defective allegations of jurisdiction, but not to add a new basis for removal jurisdiction."). Accordingly, the instant motion to remand hinges upon whether the action was properly removed to federal court on the basis of diversity jurisdiction.

### E. Diversity Jurisdiction

Diversity jurisdiction applies to cases between "citizens of different States" where "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. § 1332(a). The time-of-filing rule requires diversity of citizenship both when the state action is filed and when the removal petition is filed. *See, e.g., Fiorentino v. Huntingside Associates,* 679 F.Supp. 3, 5 (E.D.Pa.1987); *Kerstetter v. Ohio Casualty Insurance Co.,* 496 F.Supp. 1305, 1307 (E.D.Pa.1980); *Ryan ex rel. Ryan v. Schneider Nat'l Carriers, Inc.,* 263 F.3d 816, 819 (8 th Cir.2001). The rationale for the rule is to prevent defendants from manipulating jurisdiction by changing their citizenship after a plaintiff has filed suit. *Gibson v. Bruce,* 108 U.S. 561, 563, 2 S.Ct. 873 (1883).

#### a) The Voluntary–Involuntary Rule.

Exceptions to the time-of-filing rule apply where the plaintiff has either fraudulently joined a resident defendant (i.e., a diversity-destroying defendant) for the purpose of defeating diversity, *Chesapeake & Ohio Ry. Co.*

*v. Cockrell,* 232 U.S. 146, 152, 34 S.Ct. 278 (1914), [3] or has sued a resident defendant and then voluntarily dismissed that defendant from the case. *Powers v. Chesapeake & Ohio Ry. Co.,* 169 U.S. 92, 101–02, 18 S.Ct. 264 (1898); *Knudsen v. Systems Painters, Inc.,* 634 F.3d 968, 975 – 976 (8 th Cir.2011). These exceptions balance the plaintiff's right to select a state forum and the defendant's statutory right to remove a case to federal court. *Id.* at 976 (citation omitted).

*4 *Powers* concerned a case that was not removable when originally filed in state court because complete diversity was lacking. *Powers,* 169 U.S. 92, 18 S.Ct. 264. That plaintiff, however, subsequently dismissed the resident defendant, leaving only diverse parties in the case. See *id.* The United States Supreme Court allowed removal because of the plaintiff's voluntary act of dismissal. *See id.*

Two years later, the High Court decided *Whitcomb v. Smithson,* 175 U.S. 635, 658 20 S.Ct 248 (1900), and stated that a directed verdict on the merits favoring a resident defendant did not create removal jurisdiction. [4] This pronouncement came to be known as the "involuntary rule".

The *Powers* exception applies if a dismissal was voluntary. *Insinga v. La Bella,* 845 F.2d 249, 252 (11 th Cir.1988). It does not apply if the dismissal was involuntary, i.e., if the dismissal resulted from either the defendant's or the Court's action against the wishes of the plaintiff. *Insinga,* 845 F.2d at 252. If either the dismissal was initiated by the resident defendant or by a Court's order against the plaintiff's will, then the dismissal is not voluntary. *Whitcomb,* 175 U.S. 635, 658, 20 S.Ct. 248.

The purpose of the voluntary-involuntary rule is to protect a plaintiff's right to determine the forum for his action "when it is commenced ... [and] throughout the litigation." *Great Northern Ry. Co. v. Alexander,* 246 U.S. 276, 282, 38 S.Ct. 237, 239–240 (1918); *Vogel v. Merk & Co., Inc.,* 476 F.Supp.2d 996, 1004 (S.D.Ill 2007); *Jenkins v. National Union Fire Ins. Co. of Pa.,* 650 F.Supp. 609, 614 (N.D.Ga.1986)(same); *Vidmar Buick Co. v. General Motors Corp.,* 624 F.Supp. 704, 706 (N.D.Ill.1985); *Ford Motor Credit Co. v. Aaron–Lincoln Mercury,* 563 F.Supp. 1108, 1117 (N.D.Ill.1983). The rule was codified in an amendment to 28 U.S.C. § 1446(b) in 1949. *Weems v. Louis Dreyfus Corp.,* 380 F.2d 545, 548 (5 th Cir.1967).

Here, Defendant posits that there is no dispute that the dismissal of the other defendants in Superior Court was voluntary. (D.E. 19, D.Br. at *9). He is correct. It is uncontested that the dismissal was filed in the Superior Court by Plaintiff's counsel after a partial settlement was reached with three of the four named defendants.[5] That, however, does not end the inquiry.

The Court notes that the dismissal of the resident defendant in this action was voluntary and without prejudice. Defendant contends that Plaintiff has failed to cite any case that distinguishes voluntary dismissals with and without prejudice. (D.E. 19, D.Br. at *10). Conversely, Defendant has also not cited authority in direct support of his contention that a voluntary dismissal without prejudice is equivalent to a dismissal with prejudice for the purposes of removal jurisdiction. Accordingly, we have an issue of first impression that requires looking to the underlying reasons for the rule.

**\*5** The rule allowing removal following the voluntary dismissal of a diversity-destroying defendant "is premised upon the assumption that voluntary actions of the plaintiff which remove a party from a case are final" and therefore not subject to reversal on appeal. *Vogel,* 476 F.Supp.2d at 1003 (quoting *Burke v. General Motors Corp.,* 492 F.Supp. 506, 508 (N.D.Ala.1980); and citing *Ennis v. Queen Ins. Co. of Am.,* 364 F.Supp. 964, 966 (W.D.Tenn.1973) (voluntary dismissal rule is premised on the dismissal not being appealable). The question then is whether a Plaintiff relinquishes his right to keep litigation in state court by agreeing to a voluntary dismissal that is without prejudice.

Other courts have noted that the voluntary act required to create removal jurisdiction must be one that "unequivocally effects an abandonment of any resident defendant." *Schmidt v. Capitol Life Ins. Co.,* 626 F.Supp. 1315, 1318 (N.D.Cal.1986); *see also Guerrero v. General Motors Corp.,* 392 F.Supp.2d 1133 (N.D.Cal.2005) (case remanded where diversity destroying defendant had settled but had not yet been dismissed from the case). Here, Plaintiff contends that the voluntary dismissal exception should not apply because the underlying dismissal was not endorsed by the Superior Court, and was not final for purposes of appeal because it was without prejudice.

The fact that the dismissal was not endorsed or approved by the Superior Court is not unusual given the procedural status of the case prior to removal. The complaint had been filed and served, but had not been answered by any defendant. New Jersey Court Rule 4:37–1(a), provides, in pertinent part, as follows:

> ...an action may be dismissed by the plaintiff without court order by filing a notice of dismissal at any time before service by the adverse party of an answer or of a motion for summary judgment, whichever first occurs; or by filing a stipulation of dismissal specifying the claim or claims being dismissed, signed by all parties who have appeared in the action. Unless otherwise stated in the notice or stipulation, the dismissal is without prejudice. [*Id.*]

Thus, as argued by Defendant's counsel, the case against the non-resident defendant was dismissed upon submission of the Notice of Voluntary Dismissal and without need of any action by the Superior Court. (D.E. 19, D.Br. at *6–7).

However, the more important question is whether the voluntary act of dismissal without prejudice is one that "unequivocally effects an abandonment of any resident defendant." *Schmidt,* 626 F.Supp. at 1318. Plaintiff argues there was no unequivocal abandonment because the resident defendant can be re-joined in the litigation. Accordingly, Plaintiff asserts that if defendant Thorpe does not or cannot pay the amount in dispute, the dismissed defendants can be reinstated as jointly and severally liable.

New Jersey courts recognize that dismissals without prejudice adjudicate nothing and do not bar reinstitution of an action. *Malhame v. Borough of Demarest,* 174 N.J.Super. 29 (App.Div.1980). The voluntary dismissal in this action is without prejudice, and is not final for the purpose of appeal. *Vogel,* 476 F.Supp.2d at 1003 (citations omitted); *see also Insinga,* 845 F.2d at 253 (noting that the issue of finality "may be one concern underlying the voluntary-involuntary rule [...]"). Moreover, as described above, the dismissal in this action clearly contemplates the possibility of reinstating the resident defendant should

Plaintiff fail to recover the outstanding amount in controversy from Defendant Thorpe.

**\*6** After considering all of the above, the Court finds that ignoring the characterization of the dismissal in this action would be contrary to the spirit and purpose of the body of law governing removal. The voluntary-involuntary rule is grounded in the notion that the voluntary dismissal of a diversity-destroying defendant "is premised upon the assumption that voluntary actions of the plaintiff which remove a party from a case are final" and therefore not subject to reversal on appeal. *Vogel,* 476 F.Supp.2d at 1003 (quoting *Burke,* 492 F.Supp. 506, 508). Accordingly, this Court must agree that Plaintiff has not unequivocally abandoned his claims against the resident defendant, and that the voluntary dismissal without prejudice in this action is therefore not "voluntary" within the meaning of the voluntary-involuntary rule. *See Schmidt,* 626 F.Supp. at 1318.

#### F. Costs and Attorney's Fees

When ordering remand this Court is permitted by 28 U.S.C. § 1447(c) to award "just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c). Section 1447(c), provides that a remand order "may" require payment of attorney's fees—not that such an order "shall" or "should." "As Chief Justice Rehnquist explained for the Court in *Fogerty v. Fantasy, Inc.,* 510 U.S. 517, 533, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994), '[t]he word 'may' clearly connotes discretion. The automatic awarding of attorney's fees to the prevailing party would preterit the exercise of that discretion.' Congress used the word 'shall' often enough in § 1447(c)—as when it specified that removed cases apparently outside federal jurisdiction 'shall be remanded'—to dissuade us from the conclusion that it meant 'shall' when it used 'may' in authorizing an award of fees." *Martin v. Franklin Capital* Corp., 546 U.S. 132, 136 (2005).

Absent unusual circumstances, courts may award attorney fees under 28 U.S.C. § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal; conversely, when an objectively reasonable basis exists, fees should be denied. *Id.* On a close question, although removal turns out to have been incorrect, the Court may decline to award costs and attorneys' fees. *See Patterson v. Exxon Mobil Corp.,* 262 F.Supp.2d 453, 467 (D.N.J.2003) (citing *Eyal Lior v. Sit,* 913 F.Supp. 868, 878 (D.N.J.1996); *Shrader v. Legg Mason Wood Walker, Inc.,* 880 F.Supp. 366, 368 (E.D.Pa.1995)) ("Such an award of fees, incurred as a result of removal, lies in the discretion of the court, and does not require a showing of bad faith, nor that the removal was fruitless."); *see, e.g., Roxbury Condominium Ass'n, Inc. v. Anthony S. Cupo Agency,* 316 F.3d 224, 228 (3d Cir.2003) (reversing award of attorneys' fees under § 1447(c) for remand based on untimely raised procedural defect as well as the district court's rationale based upon "area of unsettled law").

Defendant had an objectively reasonable basis for seeking removal. In light of this, this Court finds that costs and fees should not be awarded to Plaintiff in this matter.

### IV. *CONCLUSION*

For the reasons set forth above, the undersigned recommends that the District Court **grant** Plaintiff's motion to remand. Pursuant to Local Civil Rule 72.1, the parties have fourteen days from receipt of this Report and Recommendation to file and serve any objections.

#### All Citations

Not Reported in F.Supp.2d, 2013 WL 11066484

Footnotes

1   A more detailed discussion of the underlying events surrounding this matter may be found in the Court's June 25, 2013 Opinion. (D.E.24).

2   In his supporting papers, Plaintiff does not contest that Defendant satisfied the procedural requirements for removal. *See* 28 U.S.C. § 1332(d)(2).

3   Defendant does not argue fraudulent joinder and counsel conceded at oral argument that each defendant was properly joined in the state court action.

4   The *Whitcomb* statement was *dicta,* but even so, "it is Supreme Court *dicta,* and, as such, requires serious consideration." *See United States v. Mazzarella,* 614 F.3d 85, 91 n.5 (3rd Cir.2010)(citing *Heleva v. Brooks,* 581 F.3d 187, 188 n.1 (3d

2013 WL 11066484

Cir. 2009) ("[W]e do not view [Supreme Court] dicta lightly."(alterations in original) (internal quotation marks omitted)); see also *Schwab v. Crosby,* 451 F.3d 1308, 1325 (11th Cir.2006) ("[T]here is *dicta* and then there is *dicta,* and then there is Supreme Court *dicta*."). Alternatively, this *dicta* may be considered to bind lower courts because it has not been enfeebled by later statements. *See United States v. Fareed,* 296 F.3d 243, 247 (4th Cir.2002)(Supreme Court *dicta* can bind lower courts, particularly when not enfeebled by later statements).

5    The settlement agreement has been referenced in both the Notice of Removal and in Plaintiff's brief in support of remand, but has not been supplied to the Court. The document is nonetheless not necessary to decide this motion for remand.

---

**End of Document**                                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT H

Philip W. Crawford, Esq.
Attorney ID No.: 023431980
Amanda M. Munsie, Esq.
Attorney ID No.: 073032013
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey  07102-5310
(973) 596-4500
*Attorneys for Defendant*
*Insys Therapeutics, Inc.*

| | |
|---|---|
| DEBORAH FULLER & DAVID FULLER, as Administrators Ad Prosequendum for the Estate of SARAH A. FULLER, Deceased, and DEBORAH FULLER, & DAVID FULLER, Individually,<br><br>Plaintiffs,<br><br>vs.<br><br>VIVIENNE MATALON, M.D., TLC HEALTHCARE 2, LLC, INSYS THERAPEUTICS, INC., LINDEN CARE, LLC, INC., JOHN DOE, 1-10 (fictitious), ABC CORPORATION 1-10 (fictitious), Individually, Jointly, Severally and/or in the Alternative,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION:  MIDDLESEX COUNTY DOCKET NO.:  MID-L-1859-17<br><br>**NOTICE OF FILING OF NOTICE OF REMOVAL TO THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY** |

TO:      Richard J. Hollawell, Esq.           Paul A. Schaaff, Jr., Esq.
            Mark C. Dewland, Esq.            Orlovsky, Moody, Schaaff, Conlon & Gabrysiak
            Console & Hollawell, P.C.          Monmouth Park Corporate Center
            Five Greentree Centre               187 Highway 36
            525 Route 73 North, Suite 117     West Long Branch, New Jersey  07764
            Marlton, New Jersey  08053       *Attorneys for Defendant*
            *Attorneys for Plaintiffs*           *Linden Care, LLC*

**COUNSEL:**

     **PLEASE TAKE NOTICE** that in the above-captioned action Defendant Insys

Therapeutics, Inc. (hereinafter "Insys" or "Defendant"), by and through its counsel, Gibbons

P.C., has this day filed a Notice of Removal, a copy of which is attached hereto as Exhibit A, in the above-captioned action with the Clerk of the United States District Court for the District of New Jersey, effecting the removal of this action from the Superior Court of New Jersey, Law Division, Middlesex County. You are advised that pursuant to 28 U.S.C. § 1446(d), the Superior Court of New Jersey, Law Division, Middlesex County, shall proceed no further until and unless this action is remanded.

**GIBBONS P.C.**
*Attorneys for Defendant*
*Insys Therapeutics, Inc.*

By: _____

Philip W. Crawford
Amanda M. Munsie

DATED: October 4, 2017

Of Counsel:

Adam P. Schwartz, Esq.
Attorney ID No.: 018351995
David J. Walz, Esq. *(to be admitted pro hac vice)*
**CARLTON FIELDS JORDEN BURT, P.A.**
4221 W. Boy Scout Blvd., Ste. 1000
Tampa, Florida 33607-5780
Telephone: (813) 223-7000
*Attorneys for Defendant*
*Insys Therapeutics, Inc.*

2

2567959.1  114002-95352